## Wytheville.

### STANDARD MANUFACTURING CO., INC., AND OTHERS V. S. M. PRICE MACHINERY CO., INC.

June 13, 1912.

1. ESTOPPEL—*Waiver—Case in Judgment.*—Upon the evidence in the case in judgment, it is held that the president of a corporation, and its principal stockholder, and his associates, had, for a valuable consideration, agreed to subordinate their rights to be paid *any indebtedness due to them* from the company until the other creditors of the company were paid in full, and hence could not thereafter be heard to assert that they did not surrender certain rights or indebtedness which they, at the time of said agreement, did not disclose to the general creditors, but now assert.

Appeal from a decree of the Circuit Court of the city of Norfolk. Decree for the complainants.   Defendants appeal.

*Affirmed.*

The opinion states the case.

*Frick & Williams*, for the appellants.

*Peatross & Savage* and *A. B. Carney*, for the appellees.

CARDWELL, J., delivered the opinion of the court.

This is a general creditors' suit, brought by the S. M. Price Machinery Company, Incorporated, on behalf of itself and all other creditors of the Standard Manufacturing Company, Incorporated, against the last-named company, George A. Frick, trustee under a deed of trust executed by the Standard Manufacturing Company on August 22, 1906, the National Bank of Commerce, of Norfolk, Va., the beneficiary under said deed to Frick, trustee, G. W. Truitt *et als.*, trustees under a deed of trust executed by the

Standard Manufacturing Company, on February 24, 1908, and George H. Lewis, Frederick Lewis, and W. H. Robinson, stockholders and creditors of the Standard Manufacturing Company.

It appears, from the pleadings and evidence in the record, that the Standard Manufacturing Company, organized for the operation of a large timber and lumber plant, situated at Suffolk, Va., was admittedly a close corporation, having originally but five stockholders—viz., George H. Lewis, Frederick Lewis, W. H. Robinson, George L. Barton, and J. C. Foster—who subscribed the nominal capital stock of $15,000, in the sum of $3,000 each. Subsequently, and before any of the stock subscriptions were paid, all of the stock was acquired by the two Lewises and Robinson. The subscriptions to the stock were not paid in money, but by the demand notes of the several subscribers, payable to the company, which were discounted at the National Bank of Commerce, and the proceeds paid into the treasury of the company and used in the course of its business. It soon became apparent that more capital was needed in the company's business, and certain advancements were made by the Lewises and Robinson, either in the form of notes given by themselves to the company, or their endorsement of the company's notes, all of which were likewise discounted, and the proceeds thereof paid into the company's treasury, George H. Lewis claiming that altogether the above-named stockholders paid into the company, for the company's purposes, in the neighborhood of $64,000.

Notwithstanding these large advancements, the company was financially unsuccessful in its business, and steadily losing money. Whereupon, the Bank of Commerce demanded of the company and of the Lewises and Robinson, who were endorsers on the paper of the company discounted by the bank, additional security, and this was given, in part, by a deed of trust conveying all of the company's property to George A. Frick, trustee, dated August 22, 1906, the said conveyance having been authorized by formal resolutions adopted by the directors and stockholders at a meeting held on that day; but the deed of trust was not acknowledged until November 1, 1906, or recorded until November 14, 1906. This deed was to secure four notes for the sum of $4,500 each, due in six months from date, one of which was endorsed by each

of the then stockholders, the Lewises, Robinson, and Barton, the latter two notes being given priority over the former two. The aggregate amount of these notes, $18,000, was fixed upon because it was the limit to which the Bank of Commerce would extend credit.

The Lewises, who, it seems, were regarded as people of means, claim to have made other advancements to the company, either in cash, notes, or endorsements of notes to or for the company, but it is not deemed necessary that these advancements be set out at length.

On January 30, 1908, the company, being hopelessly involved, and desiring to obtain from its creditors, other than the stockholders, an extension of credit for one year, prepared and urged upon the general creditors an agreement providing the desired extension, wherein, by way of consideration to the general creditors for the indulgence, the following clause was inserted: "The said stockholders, who are also creditors, agree that all other creditors shall be preferred in the distribution of such profits as may be made from the operation of the plant, or the assets of the company in the event of sale." The plan of the agreement was that the plant and effects of the company were to be turned over to five trustees—viz., George W. Truitt, Claude Dennis, Charles H. Hutchins, George H. Lewis, and William H. Robinson—and said trustees, acting as a committee, a majority of whom were to constitute a quorum for the transaction of business, were to manage the affairs of the company during the entire period covered by the agreement, as authorized and directed by the provisions of the agreement.

The general creditors having agreed to the plan and terms of said agreement, pursuant thereto a deed of trust was executed conveying to said Truitt and others, trustees, the company's property, which deed, bearing date February, 1908, was executed by the said company and George H. Lewis, Frederick Lewis, and William H. Robinson, individually.

The trustees were able to pay a dividend of fifteen *per cent.* on the indebtedness due the creditors, who had accepted notes payable in one year from the date of said agreement, but they, too, were unable to make a success of the business, and on February

24, 1909, they closed their accounts, and did nothing further, and the company assumed possession of its property. Whereupon, in March, 1909, George A. Frick, trustee in the deed of August 22, 1906, being required so to do by the National Bank of Commerce, the holder of the notes secured by said deed, advertised the company's property for sale thereunder; and thereupon the bill in this cause was filed, asking that a sale by Frick be injoined, that a receiver be appointed by the court, etc., and alleging, *inter aliam*, that the Lewises and Robinsons had never paid their stock subscriptions, but that the deed of trust to the National Bank of Commerce had been executed to secure notes of the company which were substituted for the stock subscription notes of the subscribers; and that the Lewises and Robinson should be required to pay their stock subscriptions.

The prayer for an injunction and the appointment of a receiver was denied by the court, and Frick, trustee, was directed to sell the property, which he did at public auction on April 7, 1909, at which sale the property was bid in by George H. Lewis for the sum of $21,000, which bid was reported to the court and approved, and Frick, as trustee, conveyed the property to Lewis. It appears, however, that Lewis was not required to pay the whole of the purchase money to Frick, trustee, and paid only a sufficient sum to pay the costs of sale and of this suit, the balance being left in Lewis's hands to await a final decision as to whether he was entitled to the same, or any part thereof, or whether said balance belonged to the general creditors of the company.

An amended bill was filed in the cause, to which, as well as to the original bill, there was a demurrer by the defendants, which was overruled, and answers were thereupon filed, and the cause was referred to a master commissioner to make certain inquiries and to state certain accounts, as set out in the court's decree.

In the taking of the evidence before the commissioner it developed that the subscriptions to the capital stock of the defendant company made by the defendants, the Lewises and Robinson, as alleged in the bill, had not been paid at the time of the institution of the suit; that the notes of these individual stockholders in evidence of their stock subscriptions had been given

to the defendant company, and by it discounted at the National Bank of Commerce, and that said notes were outstanding at the time of the institution of this suit; but that some time after the institution of the suit, and after the sale of said property by Frick, trustee, the said stockholders had paid at the bank their notes, and thereby paid their stock subscriptions. It was likewise developed that the National Bank of Commerce had not in reality loaned anything to the defendant company in return for the four notes aggregating $18,000, secured by the deed of trust to Frick, trustee, but that, although the resolution of the stockholders showed the deed of trust given to secure a loan to be made, as a matter of fact these notes were deposited with the said bank as collateral security for certain notes theretofore held by it, other than the notes of the stockholders given by them for their stock subscriptions.

The commissioner reported that there were held by said bank at the time of the delivery of these collateral notes, and for which collaterals were given as security, notes made or endorsed by the defendant company, and made or endorsed by the stockholders of the company, aggregating in principal $21,000, and that between November 1, 1906, the date that these collateral notes were delivered to the bank, and December 3, 1906, the Lewises, as endorsers or makers, paid to the bank notes aggregating in principal $15,400; so that on January 30, 1908, when the said agreement between the defendant company and its creditors, to which its stockholders were parties, was made, the said bank held only $6,500 of the notes made or endorsed by the defendant company, which were secured by the collateral notes aggregating $18,000, which, in turn, were secured by the deed of trust to Frick, trustee, and this $6,500 was the only amount that had been held by the said bank, secured by said collateral notes, since the 3d day of December, 1906. Therefore it appears that the amount due to said bank, secured by the deed of trust to Frick, trustee, on January 30, 1908, was $6,500 in principal, with some interest thereon, which interest, as calculated by the commissioner, makes the aggregate amount due on said collateral notes, principal, and interest, $7,509.84, the result being that if, as the general creditors contend, George H. Lewis (who is authorized by Fred

Lewis to use the notes taken up by them at the bank as offsets against the purchase money due to Frick, trustee, by virtue of the agreement of January 30, 1908, and the deed of assignment to Truitt and others, trustees, of February 24, 1908, executed pursuant to said agreement) agreed to allow the general creditors preference over all of his claims held against the company at that time, in the distribution of the company's assets arising from a sale of its property and plant, then he, George H. Lewis, is entitled to receive credit on his purchase of the property from Frick, trustee, for the amount only of said notes, aggregating, principal and interest, the sum of $7,509.84, leaving a balance of $14,310.95 due by him to Frick, trustee, for distribution among the general creditors of the defendant company. On the other hand, if Lewis is allowed to offset all the notes he claims to have paid the bank, and now asserts in this suit, as debts due to him from the defendant company, he will receive practically all of the company's assets, and its general creditors will get little or nothing.

The master commissioner made an elaborate and carefully prepared report in the cause, and, upon the main question, stated by him to be, *"Did Lewis waive his right to priority as a secured creditor under the first deed of trust, dated August 22, 1906, in favor of the general creditors?"* he reported that "the two Lewises and Robinson did not, by the agreement of January 30, 1908, and the deed of assignment of February 24, 1908, in which they joined, waive their rights as secured creditors under the first deed of trust (to Frick, trustee), and that George Lewis has a right now to offset the notes held by him, which were covered by the collateral notes secured under the first deed of trust, against the balance of the purchase money which he owes to George Frick, trustee, to the extent of the amount which may be due on said collateral notes." He then proceeds to calculate the amount due to Lewis on the original notes to secure which the notes secured by the deed of trust to Frick, trustee, were delivered to the bank as collateral, and ascertained the amount to be, principal and interest, $21,171, and the amount then due by Lewis to Frick, trustee, including interest, $21,820.79, so that the balance due from Lewis to the trustee was only $649.79; but in this calculation the commissioner disregarded whether or not the said original notes, to secure

which the collateral notes were delivered to the bank, were paid by the Lewises and Robinson before or after the agreement of January 30, 1908.

The plaintiff, S. M. Price Machinery Company, Inc., filed six exceptions to said report, but, in the view that the learned judge of the circuit court took of the case, he deemed it necessary to consider only the fourth and sixth of said exceptions, relating to the controlling question as stated in the commissioner's report; and in a written opinion, made a part of the record, in which the facts stated above in this opinion, and other facts appearing in the record, are adverted to, laying stress upon the fact that after being urged to do so by the said bank the Lewises paid off some $14,000 or more of the deed of trust indebtedness due the bank, taking no assignment of these notes, which apparently were cancelled and destroyed, and had the company issue to them its ordinary notes for the amount so advanced, payable on demand, it is said in conclusion: "So it seems to me it would be a great injustice upon the general creditors, as well as a wresting of the language contained both in the contract and deed of trust from its plain and unambiguous meaning, to allow the Lewises to hold this secret lien for some $14,000 or more, which amount is of necessity included in the $40,000 which they held out to the creditors they were yielding, in order to induce their co-operation and consent to the plan which had been devised by these defendants themselves—a device and plan which they believed would work itself out, giving them back the property clear of all liabilities to the general creditors, and thereby save them not only the amount they had paid the bank, but the entire indebtedness which the company owed them. It is neither unreasonable nor unnatural, therefore, that the Lewises, strong in the confidence of the successful termination of the plan which had been devised, should have postponed the payment of their debts in order to please the creditors, who were insisting upon payment, and were threatening proceedings looking to the liquidation of the company. They felt reasonably satisfied that by so doing both the general creditors and themselves would be ultimately paid in full. But, however that may be, the fact is they entered into this solemn contract with the creditors for a consideration which to them seemed sufficient in

law, as well as in fact, that their claims should be postponed, and I find nothing, either in the contract or the deed of trust, which seems to me to be in conflict with this view of language too plain to need construction, and I therefore feel obliged to sustain the exceptions four and six to the commissioner's report, and, as these views will, when carried into effect, probably result in the payment of all the general creditors, it seems unnecessary to consider the other questions raised upon the exceptions to the report." From a decree carrying into effect the views of the learned judge, as expressed in his written opinion, this appeal was allowed.

The assignments of error in the petition for the appeal relating to the rulings of the court below in permitting an amended bill to be filed in the cause, and overruling the demurrer to the original and amended bills, were not insisted on in the oral argument before this court, and will, therefore, not be further considered here.

The main question, as considered by the court, and rightly, is, "Did not the Lewises, by the agreement of January 30, 1908, and deed of February 24, 1908, waive their right to participate in the security of the deed of trust to Frick, trustee, even if they had such a right at the time of the execution of the said agreement and deed of trust?"

A discussion as to the law with respect to the rights of subrogation in one who stands in the relation of surety to a principal debtor, and who has paid the debt of the principal, and to enforce every remedy and every security the creditor had against the principal debtor, would serve no good purpose in the consideration of this case upon the indisputable facts to which we have adverted. The trial court was of opinion that, however it might be as to the subrogation of the Lewises to the rights of the National Bank of Commerce, they had, by the two written instruments (the agreement of January 30, 1908, and the deed of assignment executed pursuant to the agreement), in "language too plain to need construction," waived whatever right they may have had to demand payment of the indebtedness due them by the defendant company until its other creditors were paid in full. If more were needed to make plain the meaning and intent of the parties than the lan-

guage itself used in said agreement and deed of assignment, it is to be found in the interpretation given to it by appellant George H. Lewis, when testifying in this cause.

"Q. Under what circumstances was the agreement with the creditors by which this plant was turned over to George W. Truitt and others executed? A. Under the agreement that we should surrender the amount that the company owed us, provided the creditors accepted the terms of that agreement, and accepted the plant to be run under the management of the trustees for the benefit of the creditors."

Further testifying, the witness Lewis said: "They all agreed to take notes, with the understanding that the plant should be turned over to the said trustees, who would operate the plant for the creditors, and we believed that would be a final settlement of the whole matter, and we agreed not to expect the indebtedness to us, but surrendered that indebtedness; otherwise we would not have gone into any such agreement."

In view of the facts and circumstances appearing from the proof in the record, the appellant, George H. Lewis, could not be heard to say in a court of equity that, although he and his associates, in the negotiations with the general creditors of the company for an indulgence on their demands past due, and which led to the agreement providing for the indulgence asked and the deed of assignment of February 24, 1908, executed pursuant to the agreement, agreed to subordinate their rights to be paid *any indebtedness due to them* from the company, whose president and principal owner he was, until the other creditors of the company were paid in full, and then, more than two years later, and after this suit was instituted, say that "we did not surrender certain rights which we, at the time of said agreement, did not disclose to the general creditors, but now assert, and which entitled me to practically all of the assets of the company, and leaves little or nothing thereof for its general creditors."

We are of opinion that the decree of the circuit court is right, and it will, therefore, be affirmed; but the cause has to be remanded for further necessary proceedings therein, or that may be expedient, to carry out the views expressed in this opinion.

*Affirmed.*