LETTA v. CINCINNATI IRON & STEEL CO.

(Circuit Court of Appeals, Sixth Circuit. December 19, 1922.)

No. 3664.

1. Appeal and error ⊂⇒997(3)—Implied finding of facts, in verdict directed on motions of both parties, not reviewable, if supported by any evidence.

Where each party moves for directed verdict, any general finding of facts necessarily implied in the verdict directed is not reviewable, if supported by any substantial evidence.

2. Appeal and error ⊂⇒866(3)—Question for review, where verdict is directed after motions by both parties.

Where, after motion by each party for directed verdict, a verdict was directed for defendant, the question on review is whether plaintiff was entitled to an instructed verdict in his favor to any extent and on any theory raised by the pleadings.

3. Estoppel ⊂⇒90(2)—One party, who permits the other to act on misconstruction of the contract, is bound by it.

A party to a contract, who knows that the other party is acting under a misconstruction, but permits that action to go on prejudicially, is bound by that misconstruction.

4. Estoppel ⊂⇒107—When need not be pleaded.

Where an action is based on a contract, express or implied, facts which estop defendant to deny the construction of the contract claimed go to proof of the contract, and need not be pleaded as an estoppel.

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; John W. Peck, Judge.

Action at law by Paola Letta against the Cincinnati Iron & Steel Company. Judgment for defendant, and plaintiff brings error. Reversed.

George B. Goodhart and James B. Swing, both of Cincinnati, Ohio (David Bennett King and Harry T. Klein, both of New York City, and Scanlon & Carney, of Cincinnati, Ohio, on the brief), for plaintiff in error.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Frank F. Dinsmore, of Cincinnati, Ohio (Dinsmore, Shohl & Sawyer, of Cincinnati, Ohio, on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. Letta, a resident of Italy, brought suit in the court below against the Cincinnati Iron & Steel Company (hereinafter called the company), seeking to recover commissions earned by him in the sale in Italy of machines made by the company. This petition was upon the theory that there was an express contract to pay him 12½ per cent. of the selling price, or, in the alternative, to allow him a discount of 12½ per cent. from the stated price, whereby he was entitled to that margin of profit and any excess on a sale by him, or, in the event these theories failed, then that he ought to recover on the basis of a quantum meruit.

[1, 2] At the conclusion of trial before a jury, each party requested an instructed verdict in its favor, and neither one accompanied this motion with any special or alternative requests. The court directed a verdict for the defendant, making no formal findings of fact, but stating his reasons for his conclusions. Under these circumstances it is well settled that any general finding in favor of the successful party, necessarily implied by the result, cannot be disturbed, if there was any substantial evidence to support it; and if the defendant was entitled to a directed verdict, or if there were controlling issues upon which the defendant was entitled to go to a jury, the plaintiff cannot complain of the action taken. It follows that the question to be decided upon this review is whether the plaintiff was entitled to an instructed verdict in his favor to any extent and upon any theory raised by the pleadings. If not, the action of the court below was right.[1] However, in applying this rule, we think it right to assume the existence of some things which seemed to be taken for granted, while the attention of counsel and court was centered on other matters, and as to which things a new trial may show our assumption to be erroneous. For example, plaintiff's letters contained recitals, not challenged by defendant's letters or questioned on argument, and though a jury might have disbelieved, or defendant might have demanded more perfect evidence, we are accepting such recitals for the purpose of this review, as if undisputed evidence.

The court below thought that the plaintiff was not an agent for the company, but that the dealings between them contemplated only a purchase by the plaintiff from the company. Whatever the true inference from the first letters and messages exchanged, we are satisfied that as to the orders definitely procured by the plaintiff, and as to which we think there should be a new trial concerning the commissions claimed thereon, and before these transactions reached the stage where, if ever, the commissions were fully earned, the relationship was that

---

[1] The facts are very complicated. A complete statement would serve no useful purpose. The court below and counsel will understand the comment which we make upon the facts, and the case is not likely to be a precedent for the guidance of others.

of agency.[2] This inference of agency does not end the matter; for there may be an express agreement between a principal and an agent, that the latter shall have no compensation for his services unless he accomplishes a certain result; and that is defendant's contention here. It was plaintiff's theory of the contract that defendant named the minimum price at which he might sell its machines, and that his compensation was to be a percentage upon this price, plus whatever excess price he might secure. It was the defendant's theory of the contract that the minimum price named was to be net to it, and that the plaintiff was to have for compensation nothing save the excess price.

The trial judge found that the original contract between the parties was as claimed by defendant. Was there substantial evidence to support the inference which the trial judge drew? We think there was. Whatever the suggestions of earlier cables, it appears that before plaintiff made any sales he had received defendant's letter of July 12th. It is quite possible that, if the plaintiff depended upon an imperfect knowledge of the English language, or upon a translation of the letter into Italian, he might have obtained an inaccurate impression of its meaning; but it must be construed without reference to any imperfections thus introduced, and we think its meaning can be ascertained as matter of law. It offered for sale two distinct classes of goods. The first was the "Simplex" lathe. This was described, the delivery dates which were to be promised were stated, and reference was made to an attached photograph for more full description. Then prices were quoted upon this lathe in two forms, and prices were also named separately upon four attachments. Then follows: "These prices are all net, boxed New York." The letter then takes up the "G. & M." lathe, gives its description, incloses a photograph, promises delivery dates different from those on the Simplex, and then gives prices upon this lathe and upon each of four attachments, and continues: "From the above prices we allow you a discount of 12½ per cent. boxed, New York." It would be a reasonably clear conclusion that the Simplex prices were net and the G. & M. prices subject to the discount, except that the price quoted upon the first form of the Simplex did not use the word "net," while that word was used in the quotation for the second form.

However, considering the subject-matter and the structure of the letter, we think the phrase which closes the Simplex portion of the letter, "these prices are all net," must be construed to refer to all the prices so far named; and that the corresponding phrases about discount which close the G. & M. portion, refer only to G. & M. machines; and the necessary inference that upon this Simplex machine plaintiff was to get compensation measured only by the excess resale price is confirmed by the sentence pointing out that each form of that machine was selling in the United States to users at a price $100 above that quoted, thus suggesting that these prices quoted "net" to the plaintiff, gave him an opportunity to make his sales at a corresponding advance. Since plaintiff was in law bound to read the letter with care,

---

[2] October 25th the defendant says: "We are writing our Italian agents."

and interpret it rightly, it follows that he cannot recover the disputed commissions on the basis of any contract actually offered by the letter. We reach the same conclusion as to the letter of August 18th.

The record shows that the price which defendant could get for these machines in the United States was constantly rising, and the defendant was continually demanding from plaintiff new conditions not covered by the original offer.

(a) Its first offer would be interpreted as one for cash on delivery and specified no security in advance of manufacture. It later required that, before it accept an order, the entire purchase price should be in the control of a Cincinnati bank in the form of a deposit, irrevocable by the purchaser. This is what it meant by requiring that "credits" be established and be "confirmed." Whether there was any custom that would justify such a requirement does not appear.

(b) The first offer called for cash on delivery in New York. Defendant later required that the price should be paid on the production of the bill of lading, showing shipment from Cincinnati. This might be a very substantial advance in the time of payment, and, indeed, might require payment for machines which the customer never in fact received, and it does not seem to have been required until by defendant's letter of September 28th and cable of October 2d.

(c) Plaintiff's letters state, and we do not find it disputed on this record, that the specifications with the original offer provided that the spindles might be bored, at the election of customers, so as to be hollow, and suggested no additional charge for this boring. Later defendant demanded $15 extra charge for this upon each machine, and the lack of this $15 constituted one of defendant's chief objections to the sufficiency of the credits which plaintiff established. We do not observe that any demand for this extra charge was ever made until the cable of October 13th, and the present record would support the inference that this requirement was unjustified as to any of the 122 machines.

(d) The original offer proposed to make delivery of 100 machines in eight weeks. Defendant later insisted that it would do nothing towards manufacturing until there was a confirmed credit, and then would only begin delivery in 8 weeks, shipping two per day thereafter, and would require an additional margin of 30 days, and that delivery should be subject to all contingencies not in its control. It would follow that the delivery of the 100 machines need not be completed until the expiration of about 18 weeks. Plaintiff had no notice of any part of this requirement for more than 8 weeks, until about September 3d.

With reference to those customers with whom he was in negotiation, and to whom he had quoted the old terms before he had notice of these changes, and whose orders he secured upon the old terms, an otherwise sufficient right to recover his commission from defendant cannot be defeated by the refusal of these customers to submit to the substantial modifications, nor by delays caused by his efforts to get such consent from them.

[3] Between early in August, when plaintiff received the July 12th letter, and September 28th, plaintiff was proceeding to make sales, and

did procure orders for 122 Simplex lathes, and did establish credits (whole or partial) therefor. He made these sales at the same price which had been quoted net to him, and while it is apparent enough that he thought he had been offered 12½ per cent. discount on the Simplex prices, at least on the first form of that lathe, there is nothing to charge the defendant with notice that plaintiff was proceeding under this misconstruction until defendant received plaintiff's letter of September 9th. This letter made it clear that plaintiff understood he was to receive 12½ per cent. commission for Simplex sales at the quoted prices, and that on that understanding he was proceeding to get orders. Defendant received this letter on September 28th. On the same day or the day before, it received a cablegram from plaintiff saying that he had sold 122 Simplex lathes and had opened credits for the same. On September 27th or 28th, defendant cabled that it accepted the orders for the 122 machines on condition that credits be confirmed immediately, and this cable message it confirmed by letter of September 28th. This may be called its first condition. On that day it wrote another letter, acknowledging receipt of plaintiff's letter of September 9th, and denying his right to any commission upon the quoted prices and refusing to fill the orders unless he waived his commissions. This we may call its second condition.

The situation, therefore, on September 28th, clearly was: Defendant had at first quoted prices which were to be net to it, but had not made that stipulation free from confusion. Defendant knew that plaintiff had misunderstood the offer, and had interpreted it as an offer to pay commissions out of the quoted prices, and that, acting on this understanding the plaintiff had obtained orders for 122 machines, which he tendered to defendant for acceptance. Defendant had cabled its acceptance, subject to the first condition, and knew that this message would reach plaintiff September 28th or 29th, but on the 28th wrote a letter which it knew would not reach plaintiff for about three weeks, and by which it said it imposed the second condition. Even if the cable acceptance had been sent on the 27th, and the letter of September 9th was not received until the 28th, good faith required another cable, promptly specifying the second condition. Such a cable was later sent, and was received about October 14th. The controlling question thus plainly is whether, during the interval between receiving the first cable and the second, plaintiff acted in reliance upon the first cable to such an extent that he would be prejudiced by later imposing the second condition, so that defendant would be estopped to stand on the terms of the original offer; for a party to a contract, who knows that the other party is acting under a misconstruction, but permits that action to go on prejudicially, is bound by that misconstruction. We think it should be assumed, for the purposes of this review, but, of course, without prejudice to reconsideration upon another trial, that within this period of more than 2 weeks plaintiff did take substantial action in getting his customers to change their orders so as to meet the first condition, or in making it sure that this had been done, or was so understood by the American banks, or in keeping the orders alive and continuing his liability to his customers during this delay,

and this action by him would support the estoppel as to the whole order, even though it extended only to part.[3]

[4] It is said that the petition does not count upon any estoppel, and hence that the plaintiff could not recover upon that theory. The petition here is based upon a contract, express or implied. The estoppel which has been discussed arises in applying the evidence in order to learn the terms of the effective contract. Proof that defendant deliberately permitted plaintiff to act under a misconstruction of a confused contract is of the same character as proof that defendant expressly admitted the true nature of the contract which arose from all the dealings between the parties. We are not aware of any rule which requires estoppel of this character and thus arising to be pleaded.

Of these 122 machines 32 never were shipped, and the money deposited for them in New York and Cincinnati by plaintiff's Italian customers was recalled. Whether or not the condition made by the cable of September 28th, that these credits should be confirmed, was ever performed, cannot be taken as undisputed on this record; but it is clear enough that this condition was assented to in this and the other instances by the plaintiff, and that he cannot recover except upon its performance. A new trial will develop the facts on this subject, as well as with regard to the other modifications of the original offer.

The remaining 90 machines were sold and delivered by defendant to the customer whom plaintiff had procured, and the money which had been deposited to establish and confirm the credits was received by defendant. All this was after direct negotiations between defendant and the customer which resulted in acceptance by the customer of all the modifications upon which defendant insisted. The making of these sales by defendant is not necessarily an acceptance of any conditions imposed by the plaintiff when tendering the order, if those conditions were in violation of the original contract between the parties; but, as to these 90 machines, the modification of that contract which had resulted from plaintiff's misconstruction and defendant's estoppel to dispute such misconstruction required a verdict (as we construe the present record), for the plaintiff for 12½ per cent. of the first quoted price, and if the $15 per machine for reboring, which defendant exacted in addition to the quoted price, was exacted in violation of the contract perfected by the cable acceptance of September 28th, that $15 would become an excess price which the plaintiff should recover.

We find no other aspect of plaintiff's various claims, in addition to those we have discussed, where the record indicates a right to go to the jury. The question as to the estoppel resulting from defendant's cable acceptance of the 122 machine order was not sharply presented to the trial court nor discussed in the printed briefs in this court; and hence we have hesitated about basing a reversal thereon. However, it is within the assignments of error; it is unescapable and controlling upon the face of the record; it is fairly within the general claim, made below and here, that the shipping of the 90 machines was an acceptance of all the conditions upon which the order was tendered;

---

[3] See plaintiff's cable of October 7th and letter of October 8th.

and counsel have been fully heard upon the question by supplemental briefs.

We conclude that the judgment must be reversed, and the record remanded for a new trial; but the reversal will be without costs to either party.