## FIRST NAT. BANK OF BAY CITY v. YOUNG'S ESTATE.
### No. 5366.

Circuit Court of Appeals, Sixth Circuit.
May 13, 1930.

N. J. Miller, of Detroit, Mich. (Hoffman & Miller, of Detroit, Mich., on the brief), for appellant.

E. S. Clark, of Bay City, Mich. (Clark & Henry, of Bay City, Mich., on the brief), for appellee.

Before MOORMAN and HICKENLOOP-ER, Circuit Judges, and ANDERSON, District Judge.

HICKENLOOPER, Circuit Judge.

Appellant complains of the allowance in bankruptcy of an unsecured claim proved on behalf of appellee. Three chief grounds of objection are urged. These will be discussed separately.

The bankrupt corporation was organized in 1914 by Walter D. Young, a competent executive and a man of considerable means. Mr. Young became and remained its president until his death in 1916. The purpose of its organization was the manufacture and sale of ready-cut houses as an adjunct to or expansion of the lumber and hardwood flooring business of its founder. Somewhat over 82 per cent. of the capital stock was owned by the Young estate, and Walter D. Young, Jr., one of the executors and trustees of the estate, became its president upon the death of his father. While the affairs of the bankrupt were thereafter primarily under his control and management, the estate had always exercised a protective supervision of the corporate affairs and had continuously assisted the company financially. The business did not prosper. A small profit was made during the first year of its existence, and a surplus was established during 1918, by a method hereafter discussed, but, apart from these two years, operations were profitably conducted in 1919 alone. During all this time the testator at first, and the estate later, continuously poured money into the enterprise, in the form of loans or the purchase of excess inventory, in an effort to save the original investment. Separate books were kept and the bankrupt was always treated, both by the estate and by strangers, as a separate and independent corporate entity.

■ Objection to the allowance of the claim is first raised on the ground that the bankrupt was but a means or instrumentality of the estate for the conduct of part of its general business, namely, that of the manufacture and sale of ready-cut houses. No claims are prosecuted by creditors directly against the estate on this ground, but, manifestly, if the contention be sound, the trustee, as representing all creditors, has the right to raise the objection. One cannot share in a fund to be distributed only to creditors if, in fact, such a one is to be aligned with the debtors, as directly liable for the debt.

But we are of the opinion that the evidence falls far short of that necessary for application of the doctrine. The subject was recently discussed so thoroughly in the opinion of Judge Knappen in Hooper-Mankin Co. v. Matthew Addy Co., 4 F.(2d) 187 (C.

C. A. 6) that it would seem unnecessary here to repeat the discussion or to do more than to cite that precedent. Compare, also, Majestic Co. v. Orpheum Circuit, Inc., 21 F. (2d) 720 (C. C. A. 8).

■ The second objection to the allowance of the claim is founded upon the contention that a short time before the appointment of the creditors' committee to take over operation of the business, and without knowledge of the creditors, the claimant appropriated lumber belonging to the bankrupt to the value of approximately $199,000, that this appropriation of lumber to the satisfaction of unsecured indebtedness was such as would have constituted a voidable preference had bankruptcy intervened within four months, and that, even though bankruptcy did not so intervene, such appropriation by and preferential payment to one who stood in an exceedingly close relationship to the bankrupt constituted a phase of overreaching which would justify disallowance of the claim until proper relinquishment of the advantage be made. Without passing upon the soundness of this contention as a general principle of law, it is sufficient to say that it has no application in the present case. As already stated, the business was continued at a profit during 1919. Early in the summer of 1920 it became evident that the company faced serious financial difficulties. In addition to the original financial investment and the 1918 donation, to be hereafter discussed, the indebtedness of the company to the estate was as large as common prudence, and the fact that the executors were exercising solely fiduciary powers, should permit. It was therefore agreed that the estate would advance no further funds upon unsecured notes or accounts, but that, if money were needed and could not be secured elsewhere, the estate would purchase excess lumber of the company, from time to time. This sum of $199,000 is the aggregate of such purchases.

■■ The company and the estate, the latter doing business under the name of W. D. Young & Co., occupied adjoining premises and used to a large extent, and more or less indiscriminately, the same lumber yards. It is now contended that the fact that the piles of lumber were not actually moved from one yard to another, but were simply marked as the property of the estate, and the fact that the transfer of specific lumber was not always strictly contemporaneous with the advances made by the estate, brought into application section 11985 of the Compiled Laws of Michigan 1915, making the sale or hy-

pothecation of chattels void as against creditors unless accompanied by immediate delivery and actual and continued change of possession. The District Court found that the evidence did not support the contention of unwarranted intermingling of the lumber of its several owners, that the agreement above stated was entered into in good faith between the parties, and that upon sale proper invoices were exchanged and the lumber marked as the property of the purchaser. We are of the opinion that these findings are supported by the evidence. Nor do we think that the fact that opportunity was extended to the company to repurchase such lumber as it needed, at the price originally paid therefor by the estate, discloses a mortgage rather than a sale. The contract was a perfectly reasonable and valid one, redounded to the benefit of the company, and not to the damage of creditors. It was an example of the continued and continual effort of the estate to assist, protect, and develop the business of the company. When rights were exercised under it by the advance of funds, the mere fact that delivery of the lumber was not made until somewhat later, but was then made pursuant to the contract, did not disclose bad faith or convert such delivery into a transfer for a past consideration. The statute does not apply, and such deliveries were not to be classified as transfers in fraud of creditors. Each transfer was supported by what in law was a present and adequate consideration.

The final objection to the allowance of the claim is founded upon the contention that the claimant is estopped from urging said allowance by its contract to defer demand for payment of the amount due the estate of Walter D. Young, deceased, until after the entire indebtedness of said company to other creditors, agreeing to an extension agreement, should have been paid in full; and by various other elements of alleged overreaching which, it is contended, afforded unconscionable advantage to the estate and detriment to the creditors. We shall discuss first the latter contentions.

It is urged by the trustee that the relationship between the bankrupt and the estate was such as operated to the advantage of the estate, and the disadvantage of creditors in extending credit, in the following particulars. In the year 1918 operations actually resulted in a deficit. A financial statement would have shown the company to have been insolvent at the close of that year, but for the fact that on August 31, 1918, the surplus account was credited with a total of $239,464.-38. This was stated upon the books to have been made up (1) of a waiver of the claims of the Young interests for money loaned, in the sum of $146,791.29; (2) a donation of inventory by the estate in the sum of $50,000 (no precise details being given); and (3) an increase in the book value of plant and equipment based upon reappraisal, in the sum of $42,673.09. Shortly thereafter a financial statement was furnished to the Bradstreet Company which reflected the resulting healthy financial condition. The report issued by the Bradstreet Company also contained the statement: "The estate of W. D. Young has announced its intention to give this company any further assistance if necessary. The stock of this company is almost entirely held by the estate of W. D. Young, Sr., and the executors of this estate declare that it is their intention to allow none of the indebtedness of this company to go unpaid."

During the year 1919, following this statement, the business was greatly expanded and large lines of credit were established. The ratio of indebtedness of the company to other creditors than the estate was very largely increased. During the profitable operations of 1919 a previous advance of $30,000 from Mrs. Young, which was included in the amount of family indebtedness waived in August, 1918, was repaid to her, but this sum was subsequently returned to the company and no claim is now pressed by reason of either advance. Although the absence of details as to the donation of inventory, and the round figures there stated, raise some doubt as to justification for this credit to surplus, and while the repayment of Mrs. Young's $30,000 might be construed to indicate that the waiver was not absolute, but contingent, the court below found, and we are of the opinion, that there was nothing fraudulent nor amounting to willful misrepresentation in any of the foregoing circumstances.

■■ In the summer and fall of 1918 the business seemed to be established upon a firm basis. The prospect of profitable government contracts was excellent. The estate had not only invested large sums of money on organization of the company, but had recently donated further sums to put it in sound financial condition. The executors were justified in their assumption that the family fortune would remain behind the enterprise, and the estate did continue its material and active support for some years. The gratuitous declaration of intention "to allow none of the indebtedness of this company to go unpaid," could not reasonably have been relied upon as more than a graceful gesture, and as evi-

dence of deep interest and good will, when clearly unsupported by actual guaranty of such indebtedness. It is not shown to have been made in bad faith, nor to have been relied upon by any creditor. Without being relied upon as an inducement for the extension of credit, it could have no effect as an estoppel (Oklahoma v. Texas, 268 U. S. 252, 257, 45 S. Ct. 497, 69 L. Ed. 937; Wilkoff Co. v. Royal Govt. of Italy, 1 F.[2d] 264 [C. C. A. 6]), and even if creditors were thereby lulled into a sense of security, and advanced credit more readily because of it, this would not convert the statement into a guaranty under the statute of frauds. Compare the analysis of this subject in Lamborn v. Hardie Co., 1 F.(2d) 679 (C. C. A. 6). In any event an estoppel based upon these grounds would go no further than to estop the estate from taking any position inconsistent with the position that the donation and statement truly stated its then act and honest intention.

The expectation of future prosperity was destroyed or materially lessened by the financial depression of 1920 and 1921, but even then the hope, expectations, and active interest of the Young interests did not wholly fail. When these financial difficulties arose, and facing the possibility of bankruptcy of this company, to which so much time and thought of the executors, and money of the estate, had been devoted for more than six years, the proposal was made by the executors and heirs of W. D. Young that, if the creditors would extend the indebtedness of the company so that one-third thereof should be payable on each of the following, May 31, 1921, July 31, 1921, and September 30, 1921, the estate would defer collection of the amount due the estate until the entire indebtedness to the consenting creditors had been paid in full. The original proposal contained no reference to the right of the estate to make claim in the event of subsequent involuntary bankruptcy proceedings, but a creditors' committee was appointed to act in an advisory capacity, and we think that the understanding must necessarily be implied from the evidence that a working agreement, more fully defining the powers of the creditors' committee, and a formal waiver on the part of the estate, would be subsequently prepared for signature of the interested parties and exchanged.

The original proposal for extension and waiver bears the date of September 28, 1920. Apparently of the same date, but actually prepared and executed in January, 1921, we find the working agreement between the bankrupt and the creditors' committee and

the formal waiver on behalf of the estate, the latter being signed by all the executors and by all but one of the heirs. These two latter instruments both contain the provision: "That if at any time involuntary proceedings in bankruptcy shall be made effective against the said company, or said company shall be placed in the hands of a receiver or receivers, then this agreement shall be absolutely null and void, and the estate of William D. Young, deceased, shall have the right, which is hereby expressly reserved, to file its entire claim in such bankruptcy or receivership proceedings, and said claim when allowed shall participate with all other creditors of the International Mill & Timber Co. in the distribution of all moneys received in liquidation of its property and assets."

It is now contended that, in so far as the bankruptcy agreement was not included in the initial extension offer and acceptance, and because copies of the final drafts including this agreement were not furnished to all creditors, the estate must be held as estopped from claiming the right to participate in the distribution of the assets of the company, notwithstanding that it was adjudicated a bankrupt upon an involuntary petition filed June 9, 1922. This contention is untenable. The obvious general intent of the estate, in proposing the extension and the temporary waiver, was to avoid liquidation of the company and thus preserve the equity of stock ownership. The expectation of all parties was that this might be accomplished. The creditors stood to benefit greatly by the agreement, to retain intimate contact with the financial condition of the company through its creditors' committee, and to lose nothing unless the expectations of all were groundless. Accumulated profits were to be applied during the interim to the sole payment of creditors other than the estate. Dividends amounting to 19 per cent. were in fact so paid. Many of the creditors had the advantage of sales for cash to the creditors' committee during its operation. The establishment of the New York office and the disastrous attempt at expansion of the New York business were undertaken only with the consent of the creditors, and the indebtedness to the estate was increased in the sum of some $60,000. The whole purpose of the agreement would be defeated if bankruptcy were permitted to put an end to it, immediately following its execution, and, as already stated, we are of the opinion that the agreement itself distinctly contemplated that it be reduced to formal writing upon both sides. For this purpose the creditors' committee

12

represented all consenting creditors. Such creditors' committee is clearly estopped from denying knowledge of the contents of the operating and waiver agreements under the evidence here presented (Letta v. Cincinnati Iron & Steel Co., 285 F. 707, 711; Detroit, T. & I. R. Co. v. Detroit & T. S. L. R. Co., 6 F.[2d] 845, 853 [both C. C. A. 6]), and there is also evidence strongly indicating that many of the other creditors had direct notice prior to August 30, 1921, and all creditors after that date, of the claim to right of participation by the estate in the event of involuntary bankruptcy. The creditors' committee manifestly is charged with this notice from January, 1921. No word of objection or remonstrance was raised on behalf of any creditor. This is the strongest possible evidence of contemporaneous interpretation by the parties themselves, and of acquiescence in the present position of the estate.

The present case is distinguishable from Standard Mfg. Co., Inc., v. S. M. Price Mach. Co., Inc., 113 Va. 677, 75 S. E. 236, in at least the particulars above mentioned, namely: That here the continued corporate existence of the bankrupt was a fundamental condition precedent to the continuance of the offer to defer (not release), although this be implied; that the original offer contemplated reduction to written form; that in such reduction the creditors' committee was authorized to represent all creditors, and that at that time, and afterward during the operation of the business by the committee, all creditors were charged with notice and acquiesced in the appellee's present position.

We are therefore constrained to conclude that, if not necessarily implied in the original offer by the estate to defer payment in consideration of an extension by the other creditors, the bankruptcy clause was properly thereafter inserted in, and constituted a binding and subsisting part of, the contract.

The judgment of the District Court is affirmed.