**WILLARD HELBURN, Inc. v. SPIEWAK et al.**

No. 173, Docket 21569.

United States Court of Appeals Second Circuit.

Argued Feb. 3, 1950.

Decided March 2, 1950.

Harper & Matthews, New York City, for plaintiff-appellant, Harold Harper, Ben A. Matthews, Cornelius D. Crowley, Jr., New York City, of counsel.

Chambers & Chambers, New York City, for defendants-appellees, Gerald H. Chambers, New York City, of counsel.

Before L. HAND, Chief Judge, and SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The appellant, a Massachusetts corporation, sued the appellees, who are residents of the Eastern District of New York and partners in business under the firm name of I. Spiewak & Sons, to recover for the breach of three contracts under which it was alleged that the appellant, as agent for the appellees, purchased imported sheepskins to be tanned and made into finished leather under its supervision. It was alleged that the appellees refused to accept the first lot of skins after they had been tanned and finished or to pay the appellant its disbursements and commission as agreed. It was also alleged that the appellees directed the appellant, after it had purchased the second and third lots of skins, not to proceed with the tanning and finishing until further order and, though requested to do so, never gave instructions to proceed.

The appellees denied by answer that the appellant acted as their agent and asserted that they bought finished leather at a stated price per foot which the appellant failed to deliver in kind and quality as agreed. It also relied on the statute of frauds but that defense is not pressed here.

With issue thus joined, the case was tried by court, without a jury. It was found that the appellant did not act as the agent for the appellees as alleged in the complaint but, on the contrary, did make oral agreements to sell the appellees one of the lots of skins in the form of finished leather of a superior No. 2 grade, and the other two lots in the form of finished leather of No. 2 grade, as known in the trade, and that it did not deliver any of the leather as agreed. The complaint was dismissed on the merits and this appeal followed.

It is very doubtful whether on this record the evidence tending to show sales of finished leather by the appellant gives sufficient support to the findings. Yet the essential question in the case is one turning in part upon the credibility of the witnesses who testified before the trial judge, so that we do not feel warranted in saying that the findings are clearly erroneous. But the failure to consider, and errors in the exclusion of, pertinent and very substantial evidence tending to show that the appellant did not sell the appellees any finished leather but, on the contrary, acted only as agent to purchase and supervise the processing of skins into leather for the appellees, make reversal necessary.

The record shows that the appellees in September, 1946, needed leather to use in their business, which was manufacturing and selling leather garments. Such leather as they needed was in short supply and domestic leather was under price control. Wolf, an agent in New York for dealers in leather, including the appellant, testified that the appellees told him of a lot of skins they thought they could purchase, but that they would not buy them unless Jones, the treasurer of the appellant, would come to New York and inspect them. Jones went to New York for that purpose but was unable to see them and nothing further was done about them. Jones did, however, find a lot of 514 dozen Syrian skins and did talk by telephone on September 10, 1946 with the appellee Philip Spiewak about them. This lot of skins was then purchased by the appellant and is the first lot above mentioned. Jones went back to Peabody, Mass., where the appellant was in business, and on September 13, wrote as follows to Spiewak.

"In accordance with our telephone conversation the other day, we bought for you a lot consisting of 514 3/ dozen skins of Syrian Semi-tanned sheep. We paid $1.00 per lb., duty paid, ex Warehouse, New York City, on the actual reweights of the bales. Since the bales contained no false weight, this is a fairly reasonable basis as skins go today.

"As soon as these skins can be moved from New York, we will have them shipped here to the tannery and immmediately put into process.

"We will supervise the tanning and finishing of the skins, and see to it that they

are scheduled through the factory just as fast as possible. If it is satisfactory to you, we will add 1½¢ per foot to the actual tanning cost, to cover the commission for services rendered by Ralph Wolf and Willard Helburn, Inc. As near as I can figure it at the moment, the total cost for the leather made from these skins will run just under 32¢ per foot, table run.

"The 3,000 dozen Semi-tanned Iraq skins owned by Andresen, which I was unable to see earlier this week, have been sold. Someone who had seen and examined them previous to the Seamen's strike, bought them on the basis of his earlier inspection. There are other parcels of similar skins in New York, and I expect to see some next week if it is possible then to get onto piers and warehouses that are now closed by picket lines. I also expect to be able to see several parcels of hair skins, that might also be good prospects for garment leather. I will report to you if any of these look promising. My present plan is to be in New York on Wednesday, Thursday and Friday of next week."

The appellees received this letter in due course but made no reply. When the appellant first offered it in evidence it was excluded, but later the objection to it was withdrawn and it was admitted. However, the opinion of the trial judge shows that he did not consider that appellees' failure to answer it could be acquiescence in the terms of the agreement as stated in it, but rather treated the letter as simply a self-serving declaration in no way binding upon the appellees.

In taking the position the judge did, we think he misconceived the limits of the holding in Leach & Co., Inc., v. Peirson, 275 U.S. 120, 48 S.Ct. 57, 72 L.Ed. 194, 55 A.L.R. 457, the case on which he principally relied. The unanswered letter there held inadmissible contained an assertion of the writer, who had several months previously purchased bonds through an agent of the addressee, the seller, that the agent had agreed at the time of purchase that the seller would take the bonds back at cost at any time the purchaser desired. This statement was coupled with a notice that the writer so desired and an inquiry as to when

the bonds should be delivered. It was said that the writer could not "make evidence for himself by writing a letter containing the statements that he wishes to prove" and that "a failure to answer such adverse assertions in the absence of further circumstances making an answer requisite or natural has no effect as an admission." 275 U. S. at page 128, 48 S.Ct. at page 57.

In the present instance there was an abundance of "further circumstances making an answer requisite or natural" if the appellees did not accept the letter as a substantially correct statement of the oral arrangement between the parties resulting from the recent telephone conversation to which reference was made. If the appellees did acquiesce in the portions of the letter indicating that arrangement it was but natural that no reply be made. This letter was just what an agent, who had been employed to do the things stated, would be expected to write in reporting to his principal what he had done, and was intending to do, to carry out the arrangement made "the other day" by telephone, i. e., three days previously. No dispute had arisen between the time of the telephoning and the writing of the letter and the time interval was so short that the letter was plainly admissible as a timely written memorandum stating to the appellees the appellant's understanding of the oral contract they had made. Crown Central Petroleum Corp. v. Bates, 5 Cir., 37 F.2d 508, certiorari denied 281 U.S. 743, 50 S.Ct. 348, 74 L.Ed. 1156; Wilmoth v. Hamilton, 3 Cir., 127 F. 48.

Moreover, it put the appellees on notice that the appellant expected, unless the appellees disagreed, to receive the commission of 1½ cents per foot for its services and those of Wolf. Unless the appellees were satisfied to be charged the commission it was incumbent upon them so to notify the appellant. In the absence of any explanation for their remaining silent, proof that they did so remain, knowing, or chargeable with knowledge, that the appellant was continuing to perform under the impression that the commission was satisfactory to them would create an estoppel which would have the same effect as their express assent to the terms stated in the

letter. Letta v. Cincinnati Iron & Steel Co., 6 Cir., 285 F. 707; Allen-West Commission Co. v. Patillo, 8 Cir., 90 F. 628.

No dispute arose between the parties until representatives of the appellees, on January 7, 1947, were in Peabody and inspected some of the leather made from the skins. It was not satisfactory to them and they then refused to accept it, claiming that the appellant had sold leather as above stated. Meanwhile, however, the appellant had on October 31, 1946 sent the appellees an invoice covering the first lot No. 25 bales 514 4/ doz. Syrian Semi-tanned Sheep N. Y. weighing net 9693 pounds which were charged at one dollar a pound to which was added warehouse charges and the cost of transportation from New York to Peabody, Mass. On November 30, 1946 appellant sent the appellees a statement of account covering the above invoice and another invoice in the amount of $9.18 which remains unidentified except by a number. On December 10, 1946, the appellant sent the appellees another invoice as follows covering the second lot of skins;

"Charges incurred for your account in connection with purchase of about 1,000 dozen Turkish Pickled Sheepskins—Lot No. 912.

| | |
|---|---|
| 11/ 6/46—Cost of opening Letter of Credit V-5111 | 17.00 |
| 12/10/46—Sight draft paid under Letter of Credit V-5111 | 21,594.04 |
| Bank Charge — ⅛% Commission | 26.99 |
| | 21,638.03 |

Please note: Additional charges shall be passed as they are incurred."

[3, 4] The appellees received and retained these papers without protest until January 7, 1947 and on January 9, 1947 returned the invoices for the first two lots. They were excluded when the appellant offered them in evidence at the trial. This was error. It is well settled that when an account which has been rendered remains unquestioned for a reasonable time after its receipt that fact is evidence, though of course not conclusive, that the account as rendered has been accepted as correct. Leather Manufacturers' Nat. Bank v. Morgan, 117 U.S. 96, 6 S.Ct. 657, 29 L.Ed. 811; Veneri v. Draper, 4 Cir., 22 F.2d 33, certiorari denied 276 U.S. 633, 634, 48 S.Ct. 339, 72 L.Ed. 742; see 4 Wigmore on Evidence (3rd Ed.) § 1073. These invoices were for expenses incurred in the purchase of skins and support the appellant's other evidence to the effect that it was acting as the agent of the appellees in acquiring the skins, and had not, as the appellees contended, sold them finished leather of a definite grade at an agreed price per foot.

Judgment reversed and cause remanded for a new trial.

L. HAND, Chief Judge (concurring).

I agree that the judgment should be reversed, but I would go further than my brothers. Upon this record I think that any conclusion would be "clearly erroneous" which did not find that the agreement between the parties was not a contract of sale, and was an employment of the plaintiff to buy the three parcels of skins as the defendants' agent. Had the case been tried to a jury, I might have had doubt whether it would have been right to direct a verdict; but we have a larger power over the findings of a judge. The letter of September 13, 1946, was entirely plain, and Spiewak did not pretend that he did not understand it as it read. He tried to avoid its effect by swearing that he called up Wolf and complained of its version of the relations between the parties; and that Wolf led him to believe that it was written only as a cover to evade the price regulations then in force. I assume that he wished the judge to understand that the invoices also were prepared in furtherance of the same disreputable scheme.

Not only is that explanation to the last degree improbable, but to advance it as an excuse answers any doubts which might otherwise have lingered in my mind. The stake which the plaintiff had in the ventures was far too little to make it likely that it would expose itself to criminal prosecution. But that aside, if the letter was intended as a mask, it was a masterpiece of deception, for it bears every internal evidence of good

faith; its composition with the writer's tongue in his cheek demanded an ingenuity which I should find it hard to impute to men of affairs. Moreover, it is preposterous to suppose that it should have been sent to the defendants *without* explanation and *without* prearrangement, although it flatly contradicted the true agreement. The plaintiff must be supposed to have anticipated that Spiewak would at once recognize its false character and appreciate that it was not seriously intended, which, according to his own testimony, he did not do; and, as every one would agree, he would not do. I would not accept such a cock-and-bull story from any one; to me it is apparent that the defendants, finding a losing contract on their hands, were merely trying to repudiate it; and I would direct the district court so to find upon the second trial unless the record were different.