## In re LAKE CHELAN LAND CO.

### OLIVE v. TYLER.

(Circuit Court of Appeals, Ninth Circuit. May 5, 1919.)

No. 3223.

1. CORPORATIONS ⟺316(1)—TRANSACTIONS WITH DIRECTORS—LOANS—VALIDITY.

An insolvent corporation, in need of funds and ready cash, may borrow the amount needed from a director or other officer of the corporation, and secure it by lien on its property or transfer of its assets.

2. BANKRUPTCY ⟺163—LIENS—VALIDITY.

Where the directors of an insolvent corporation, in good faith and with the intention of saving the business, borrowed money from a director and a stockholder to meet the most pressing obligations, and executed a real and chattel mortgage on all of the corporate assets to secure the same, held, the transaction being one in good faith, that the mortgage could not, on the corporation's subsequent bankruptcy, be questioned on the ground that it was preferential and to an officer of the corporation.

3. BANKRUPTCY ⟺467—APPEAL—FINDINGS.

Findings of the referee, affirmed by the District Court, and supported, will not be set aside by the Circuit Court of Appeals.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

In the matter of the Lake Chelan Land Company, a corporation, bankrupt. The mortgage claim of C. B. Tyler was allowed by the

---

referee and established as a preferred claim, and from an order denying the petition of Walter M. Olive, as trustee in bankruptcy, for review, and confirming the order of the referee, the trustee appeals. Affirmed.

This is an appeal by the trustee of the bankrupt corporation from an order of the District Court denying the trustee's petition for a review, and confirming the order of the referee, sustaining the mortgage claim of one Tyler; Tyler having offered proof of a secured claim, which claim was established and allowed as a preferred claim by the bankruptcy court over the objections of creditors. The substance of the referee's findings, as adopted by the District Court, makes this case:

The bankrupt corporation organized in 1909, with a capital of $500,000, to hold, develop, and sell a large tract of land. There were a small number of stockholders, and large sums of money were raised by pro rata assessments upon the stockholders. The company gave its notes for such advances of money, and upon unsecured obligations about $340,000 were borrowed. In addition to these obligations, the company owed debts for money borrowed upon its notes, which were secured by pledges of certain purchase-money contracts, covering lands that the corporation had sold, in the sum of $110,000, $50,000 of which notes were held by the National Bank of Commerce of Seattle, and $60,000 held by certain individuals. In June, 1916, these secured notes were past due, and the bank notified the corporation that payment must be made by January 1, 1917.

About that time one Furey became a stockholder and was elected president of the corporation. He held one-fourth of the total amount of stock and one-fourth ($85,000) of the stockholders' notes that had been issued. After demand was made for payment, Furey assured the stockholders that he could raise the money in the Eastern cities to meet the obligations of the company, but after efforts he failed to do so. To avert the then apparent ruin of the corporation, unless it could borrow money, two stockholders, Green and Tyler, were asked, and agreed, to furnish the needed money to meet the obligations, which by that time amounted to about $116,000, due upon secured notes and other debts, exclusive of notes due to stockholders. After the matter was discussed among the stockholders, it was decided that the corporation should borrow $120,000 from Green and Tyler in order to pay the obligations and to carry the company along for a few months, during which time Furey hoped that he could borrow enough money to save the business. His general purpose was to realize funds through the sale of bonds of an irrigation district to be organized, the district to take over a water system in which the corporation had an interest.

At that time the shares were owned as follows: Tyler had three-eighths, Green one-fourth, Furey one-fourth, and Swalwell one-eighth. There were some shares held by qualifying persons. On December 14, 1916, a stockholders' meeting was held, at which all of the stockholders, seven in number, were present or represented, and the corporation, by unanimous vote, was authorized to borrow $120,000 of Green and Tyler, and to secure the obligation by a mortgage upon all of the property and assets of the corporation. Upon the same day the trustees met and authorized the mortgage, and with provision therein that all of the income should be applied upon the mortgage. The mortgage was duly executed, and among other things provided that, while the company should continue in business and make sales, the income from sales should be applied in the reduction of the mortgage debt. In carrying out this plan, the $120,000 was paid to the company by Green and Tyler, and the company issued 12 notes, of $10,000 each, payable to bearer, dated December 30, 1916, due on or before one year after date, and executed a real and chattel mortgage, dated December 30, 1916, upon all of its property, which mortgage was recorded January 22, 1917. The notes owned by Green were afterwards transferred to Tyler. The secured obligations were paid, as also were the other obligations, except what was due upon stockholders' notes, and any sums due as assessments for irrigation

purposes upon the cultivated lands of the company, which, under the terms of contracts between the company and the water company, were first liens upon the lands to which the water was furnished. The collateral to secure the old notes was delivered to Furey, president, and by using the $4,000 over the sums paid out on secured claims the corporation ran along with the hope of continuing. About August, 1917, 550 acres of the lands of the corporation, valued at about $93,000, were transferred by Furey, as president, to one Brown. Furey turned over to Brown the stockholders' note for $84,500, with interest, which was owned by Furey, to enable Brown to turn the note into the company as a payment for the 550 acres of land.

Tyler, as the holder of all the notes, immediately brought foreclosure proceedings in the United States District Court, alleging that the company had not paid the interest on the mortgage, or taxes on its property. Very soon thereafter, September 13, 1917, a voluntary proceeding in bankruptcy was initiated by the secretary by direction of a majority of the trustees. Afterwards, at a stockholders' meeting held October 4, 1917, the action of the trustees in directing petition for bankruptcy was fully ratified. Furey protested.

After the trustee in bankruptcy was elected, and after the mortgage given to Tyler had been questioned by Furey and others, an order upon Tyler was issued to show cause why the property should not be held by the trustee in bankruptcy free and clear of the lien of his mortgage. Tyler appeared and propounded his claim. Objections were made by certain creditors and by the water company; the contention of the creditors being that the mortgage was preferential, and not given for a valuable consideration, while the water company claimed rights under its contract as superior to Tyler's mortgage.

It was also found that at the time the loan in question was made, and the mortgage was given to secure the same, the corporation was insolvent; that the mortgage was given to secure the money then loaned to the corporation, and was not for any antecedent indebtedness; that Green was an officer of the corporation at the time the loan was made, and knew of its insolvent condition; that, after the disbursement of the fund raised by the loan, the debts remaining unpaid were not pressing for payment, and that the stockholders and directors were fully advised of the purpose of the loan, the apparent necessity therefor, and of the affairs and financial condition of the company; and that the corporation continued its usual course and conduct of business for approximately nine months after the loan, when the conveyance of the 500 acres heretofore referred to was made.

Carroll B. Graves, of Seattle, Wash., and R. S. Ludington, of Wenatchee, Wash., for appellant.

Ira Bronson, J. S. Robinson, and H. B. Jones, all of Seattle, Wash., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). [1, 2] The contention of the trustee is that majority directors and stockholders of an insolvent corporation, having knowledge of insolvency, cannot take a mortgage on all of the property, assets, and income of the corporation, and thus prefer themselves; that the mortgage in question was made by the directors and officers with intent to prefer their claims; that the mortgage was used by the directors and officers to secure themselves upon a prior obligation, which they had assumed with the Bank of Commerce; that Tyler could not propound and prove the mortgage and secured notes as the real owner of the claims, because one Backus owned $40,000 worth of notes, and Green owned $20,000 worth thereof, and that these interests had not,

in any manner, been transferred to Tyler; and that Green, one of the mortgagees, had never assigned his interest in the mortgage.

The question of the condition of the corporation and of the good faith of the directors and officers at and about the time of the transactions under investigation being most important, we have carefully considered the whole record, with the principle in mind that the mortgagees were bound by those rules of conscience and fairness which courts of equity have laid down in disposing of transactions, where directors of corporations are dealing with the subject-matters of their trust and with the party whose interests are within their care. Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328.

It is evident that the loan to the corporation was made after Tyler and Green were urged to lend the money and after the failure of earnest efforts to obtain money from outside sources. It was evident that the corporation would fail unless it could procure money to meet its pressing obligations, but it was believed by stockholders and directors that if funds could be borrowed operation could be continued, and the immediate necessities could be met, and the company could work through its difficulties. Two courses seemed open: The directors could stop business and close up the affairs, or, in good faith, they could lend it money, thus enabling business to go on for the apparent benefit of the corporation. The directors and stockholders chose the latter plan, and, while disaster eventually came, it has been found that good faith on the part of the directors characterized their conduct. We find no foundation for the argument that the money loaned by Green and Tyler was to enable the company to pay its antecedent debt. The advances were present ones, to be used by the corporation to pay its pressing debts, and to enable it to extricate itself from immediate embarrassment, and in the expectation that it could continue in business and meet its obligations. Under such circumstances the mortgage was not invalid, though made to an officer of the corporation. 7 R. C. L. § 775; Sanford Tool Co. v. Howe et al., 157 U. S. 312, 16 Sup. Ct. 621, 39 L. Ed. 713.

Strohl v. Seattle Nat. Bank, 25 Wash. 28, 64 Pac. 916, cited by appellant, was a case where the security was given for an antecedent debt. The decision is not authority for holding that a mortgage given by an insolvent corporation for a present advance is not valid. It is referred to in 10 Cyc. 1261, as sustaining the validity of such mortgages, and Thompson on Corporations, § 6200, makes the following comment upon it and other like cases:

"It must be noted that the cases make a very clear distinction between the fact of securing a director for money loaned or advanced to a corporation and the fact of giving the director preference by way of security for any claim that he may have against the corporation. There is no reason why even an insolvent corporation, in need of funds and ready cash, may not borrow the amount needed from a director or other officer of the corporation and secure him by a lien on its property or a transfer of its assets."

See, also, Twin-Lick Oil Co. v. Marbury, supra; Illinois Steel Co. v. O'Donnell, 156 Ill. 624, 41 N. E. 185, 31 L. R. A. 265, 47 Am. St. Rep. 245; Cook on Corporations, § 692. Of course, if there had

been fraud or action by the mortgagees to secure an undue advantage to themselves, by endeavoring to acquire all of the assets of the corporation under mortgage, a different question would be presented. But the findings are against such conclusions. It is true that a prior indebtedness of $110,000 existed and was secured by contracts for sales, and that the new mortgage by the corporation was for $120,000 and covered the land, and it may be that the security was excessive. However, when it is considered that the property would have to be sold on judicial sale, that the bidding would be open to all, and that a sale would be subject to redemption, and that the mortgagees would only be entitled to receive the amount of the mortgage indebtedness, it is not to be held that undue advantage was being taken by the mortgagees in taking all the assets as security.

[3] As to all other material matters, it is sufficient to say that the findings of the referee, affirmed by the District Court, are supported, and will not be set aside in this court. In re Dorr, 196 Fed. 292, 116 C. C. A. 112.

We think that the lower court was right in holding the mortgage to be valid. The court went no farther, and by its decision did not adjudicate questions of the claim of the water company to a superior lien.

The order appealed from is affirmed.