## BARLOW v. BUDGE.
## In re LIBERTY POSTER CO.
### No. 12008.

Circuit Court of Appeals, Eighth Circuit.

April 20, 1942.

Rehearing Denied May 11, 1942.

Louis H. Joss, of Minneapolis, Minn. (M. E. Culhane, of Minneapolis, Minn., on the brief) for appellant.

Edward J. Loring, of Minneapolis, Minn. (Albert M. Anderson, of Minneapolis, Minn., on the brief), for appellee.

Before SANBORN and JOHNSEN, Circuit Judges, and NORDBYE, District Judge.

SANBORN, Circuit Judge.

The question for decision is whether the claim of the appellee, who was a director, an officer and a stockholder of The Liberty Poster Company, which has been adjudged a bankrupt, must be subordinated to the claims of other creditors.

The bankrupt is a Minnesota corporation, which was organized in 1919 by C. A. Rose, F. H. Paulsen, W. P. Budge and R. E. Morrissey to do a printing business. Its· capital stock was $20,000, of which each of its stockholders owned one-fourth. In 1925 Paulsen, who had been Vice-President, withdrew and sold his stock to the other stockholders, each of whom thereafter owned one-third of the stock of the corporation. After 1925 its stockholders were Rose, Budge and Morrissey, and its acting and active directors and officers were Rose and Budge. Rose acted as President and General Manager; Budge, as Secretary and Treasurer. In 1938 Morrissey became a director.

From 1919 to 1930 the bankrupt's business was reasonably successful, but, like many other corporations, it then fell upon evil days. In 1931 its net profit was $109.-22, and that was the last year in which it made a profit, except for the year 1935 when a net profit of $332.30 was realized. In the years 1930 and 1931 Budge's salary of $1,040 per annum was not paid. By 1934 the capital of the bankrupt. was impaired to the extent of $2,169.97. In 1935 there were occasions when the bankrupt was without sufficient funds to meet the weekly payroll, and at such times Budge made necessary advances. In 1935 the total advances made by Budge were $3,450. In 1936 a new press was purchased for $13,200. An old press, for which $3,-

500 was allowed, was exchanged in part payment. Budge advanced $2,000 in cash, and the $8,000 balance of the purchase price was covered by a mortgage. During 1936 the corporation had gross sales of $55,302, but by the end of the year the impairment of capital was $2,926.63. In February, 1937, Budge advanced $500 to the bankrupt, and in August, 1937, $250. He received from the bankrupt, in part payment of its indebtedness to him, $2,060 by 1932, $1,000 in 1936, and $250 on September 8, 1937. Budge advanced to the bankrupt a total of $6,200; it owed him for salary for the years 1931 and 1932, $2,080; and it had paid him $3,310, leaving an unpaid balance due him of $4,970. He made no advances after August, 1937, and received no repayments after September 8, 1937. From July 1, 1937, the claims of other creditors of the bankrupt began to accumulate. At the end of 1937 the bankrupt owed creditors other than Budge $4,913.15, and the impairment of capital was $8,932.29. By the end of 1938 additional indebtedness to creditors amounted to $4,374.18 and capital impairment was $14,634.48. The corporation was adjudged bankrupt April 22, 1939. The schedules showed liabilities (including the indebtedness to Budge) of $14,646.22, and assets of $11,748.81.

Budge filed a claim for $4,970. The Trustee objected to the allowance of the claim. A hearing was had before the Referee. Budge testified, in substance, that he had made the loans to the corporation in good faith and to supply necessary funds; that no arrangements were made with other stockholders before the advances were made, but that at times he told Rose he would put in money; that all of the transactions were shown upon the books of the corporation; and that there was no agreement as to the withdrawal of the funds advanced. Budge further testified that he kept the books of the bankrupt and drew its checks. He charged no interest for the advances. He made no charge for his services after 1931. The Trustee conceded that Budge advanced the money he claimed to have advanced and that it was used for corporate purposes. No question was raised as to the reasonableness of Budge's claim for salary for the years 1930 and 1931, and the Referee evidently treated the salary claim as having been discharged by the repayments made prior to 1935.

The charter of the bankrupt limited the indebtedness to $10,000. The by-laws provided for a board of three directors, who should control and manage the corporation. The by-laws also provided that no contract by the "General Manager" for the purchase of equipment involving more than $200 should be entered into without the approval of the board of directors, and that no dividends should be declared which would impair the capital of the corporation. The by-laws provided that the officers' salaries should be fixed by the board of directors. The last action of the board of directors with reference to salaries, as shown by the minutes, was taken at a meeting of stockholders held July 19, 1921. Meetings of stockholders and of directors were held on July 18, 1922, at which Rose, Paulsen and Budge were elected directors and President, Vice-President, Secretary and Treasurer, respectively. There were no records of any other meetings of stockholders or directors from 1922 until 1938. Rose was the manager of the business and was paid $45 a week from the beginning. Rose and Budge ran the business and on many occasions would get together and discuss its affairs. Income, social security, and unemployment tax returns were made by the bankrupt as a corporation. The creditors dealt with it as a corporation. There can be no doubt that Rose and Budge dominated and controlled the affairs of the bankrupt and that they did not observe the formalities of corporate management with respect to holding meetings of stockholders and directors. Neither did they observe the charter requirement that the indebtedness of the corporation should not exceed $10,000, for, in the year 1935 and thereafter, the indebtedness was in excess of that amount. They did not procure the formal approval of the board of directors for the purchase of machinery, and ignored the provision of the by-laws in that regard. It is to be noted, however, that the advisability of purchasing the new printing press in 1936 was discussed and presumably its purchase was informally approved by all of the stockholders of the bankrupt.

The Referee found that Budge had acted in good faith and that his acts and conduct could not be considered even constructively fraudulent as to other creditors and that he was entitled to share in the assets of the estate on a parity with them. The Trustee petitioned for a review of the

Referee's order. The District Court ordered the claim of Budge allowed, saying: "I find nothing here suggesting 'the history of a deliberate and carefully planned attempt' on the part of Budge to accomplish a fraud on creditors such as was the situation in Pepper v. Litton, 308 U.S. 295 [60 S.Ct. 238, 84 L.Ed. 281], upon which the Trustee so heavily relies. The controlling features in this case it seems to me are the presence of the conceded good faith of the claimant and that in this good faith the loans were made for the benefit of the corporation. Under such circumstances equity and good conscience suggest the allowance of the claim."

The appellant contends that the facts compel the subordination of Budge's claim to the claims of other creditors. He asserts that the domination and control shown to have been exercised by Budge and Rose made them fiduciaries, and that when Budge's claim was challenged the burden was upon him to show the fairness of his dealings with the assets of the bankrupt on behalf of creditors, and that his evidence shows that the affairs of the corporation were conducted for the benefit of himself and Rose and to the detriment of creditors. The Trustee also asserts that the substance and form of corporate management was disregarded by Budge and Rose, and that they conducted the business as though it were a partnership or joint venture. The Trustee further argues that Budge's contributions were made to preserve his own investment and should be treated as contributions to capital at least in so far as other creditors are concerned.

It can not be said that appellant's contentions are without merit. While there can be no doubt of the validity of the claim of Budge against the bankrupt, one can believe that, because of the way in which he and Rose managed the business and because of their failure to conduct the affairs of the corporation in accordance with the charter and by-laws, Budge's rights as a creditor should not be placed upon an equitable parity with the rights of other creditors in a distribution of assets. It is probable, we think, that the Referee and the court below could have subordinated the claim of Budge to the claims of other creditors on a finding that his informal and irregular conduct of the affairs of the bankrupt had prejudiced their rights and was a violation of Budge's duty toward them. We hesitate to say, however, that, under the evidence, the court of bankruptcy was compelled to subordinate Budge's claim to the claims of other creditors, believing, as it did, that Budge was guilty of no fraud and of no unfairness in his dealings with the bankrupt. As a practical matter, it is difficult to see in what way the informal manner in which the corporate affairs were handled prejudiced the rights of creditors. There is no claim that any creditor was deceived as to the nature of the bankrupt's business, as to who was in charge of its affairs, or as to its financial condition. The books of account were properly kept and reflected the assets and liabilities of the bankrupt. It is, of course, evident now that from a creditor's standpoint it was a mistake to attempt to continue the business of the bankrupt after 1930 or 1931. It is not our understanding, however, that a mere mistake of judgment in continuing a business which is in financial difficulties is in any respect akin to fraud or unfairness. The unfavorable business conditions which prevailed during the 1930's are a matter of common knowledge. Businessmen were urged to continue operations in the face of adverse conditions, to prevent further unemployment and in the hope that their businesses might survive. Legislation, both state and national, was enacted to prevent individuals and corporations from going to the wall. That Budge and Rose met with failure in their attempts to make the bankrupt's business successful does not seem to us a sufficient basis to justify penalizing Budge for participating in the attempt. All that Budge and Rose did directly and informally, they could have done indirectly and formally. Whatever was done by the bankrupt in borrowing money from Budge was apparently known to and approved or fully acquiesced in by all of the three stockholders. The evidence does not justify an inference that Budge manipulated the affairs of the corporation for his own personal advantage. The inference which is justified by the evidence is that the advances which Budge made were made in good faith to enable the bankrupt to meet pressing obligations and to remain in business. The advances were made before the creditors, to whose claims it is now contended Budge's claim should be subordinated, had become creditors.

444

■ The rule appears to be that where a claimant is a person or corporation having complete ownership and control of a bankrupt corporation, which the claimant has organized, controlled and operated as a mere agent, adjunct or instrumentality for his own purposes and benefit, the courts will disregard the corporate entity at least so far as other creditors are concerned and deny to the alleged creditor participation on a parity with them.[1] But, while the dealings of an officer, director or stockholder who files a claim against a bankrupt corporation for money loaned to it will be subjected to rigorous scrutiny and the claimant required to prove the good faith of the transaction upon which the claim is based and also its fairness from the point of view of the corporation and those interested in it (Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425; Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281), his relation to the bankrupt will not prevent the allowance of his claim on a parity with other creditors if he can show that the money was needed by the corporation and was used for proper corporate purposes and that the transaction between him and the corporation was open, honest and free from unfairness or fault.[2]

■ We think that the duty and responsibility of determining whether, under the applicable law, the claim of Budge was upon an equitable parity with the claims of other creditors was primarily that of the bankruptcy court, which was charged with the administration of this insolvent estate, and that this Court would not be justified in setting aside the order appealed from unless convinced that it was clearly erroneous. We are not convinced that it was clearly erroneous.

The order appealed from is affirmed.

JOHNSEN, Circuit Judge (dissenting).

I am unable to agree, in the circumstances of the present bankruptcy, that Budge's claim position is on the same equitable level as that of the other general creditors, and believe that payment of his claim should be subordinated to theirs. The question involved, of course, is not one of legal validity but of equitable parity.

The general rules applicable to the claims of officers, directors and stockholders of a bankrupt corporation are quite fully discussed in Pepper v. Litton, 308 U.S. 295, 306-311, 60 S.Ct. 238, 84 L.Ed. 281. The claims of officers and directors and those of a dominant stockholder or stockholder group should be rigorously scrutinized, not merely to test their legal validity as against the corporation, but equally to weigh the fairness of their asserted position in relation to other creditors. The fairness of relative claim position should be tested, not simply as of the date of the transactions involved, but with a regard also for the corporation's subsequent operations, in the light of the claimant's degree of connection with and measure of responsibility for such operations. If, when thus viewed, the claim of an officer, director or stockholder, notwithstanding its legal validity, soundly impresses the bankruptcy court, in the comparative situation, as failing to rest upon the same level as the corresponding claims of other creditors, its payment should be subordinated.

This does not mean, of course, that the valid claims of those who occupy a fiduciary position in the affairs of the corporation can be subordinated merely because other creditors will not be paid in full, for that situation necessarily obtains in almost every bankruptcy. But such claims may properly be subordinated, if the trans-

---

[1] In re H. Hicks & Son, Inc., 2 Cir., 82 F.2d 277; Forbush Co. v. Bartley, 10 Cir., 78 F.2d 805; In re Kentucky Wagon Mfg. Co., 6 Cir., 71 F.2d 802; In re Burntside Lodge, Inc., D.C., 7 F. Supp. 785; In re Mill Run Lumber Co., D.C., 4 F.Supp. 807; Clere Clothing Co. v. Union Trust & Savings Bank, 9 Cir., 224 F. 363; Pepper v. Litton, 308 U.S. 295, 307–311, 60 S.Ct. 238, 84 L.Ed. 281; 8 C.J.S., Bankruptcy, § 385, pp. 1217, 1218.

[2] Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 589, 590, 23 L.Ed. 328; Pepper v. Litton, 308 U.S. 295, 306, 307, 60 S. Ct. 238, 84 L.Ed. 281; Finn v. George T. Mickle Lumber Co., 9 Cir., 41 F.2d 676; First National Bank v. Young's Estate, 6 Cir., 41 F.2d 8; Wheeler v. Smith, 9 Cir., 30 F.2d 59; In re Sassy Jane Mfg. Co., 9 Cir., 4 F.2d 55; In re American Range & Foundry Co., D.C., 22 F.2d 558. See, also, Sanford Fork & Tool Co. v. Howe, Brown & Co., Ltd., 157 U.S. 312, 15 S.Ct. 621, 39 L.Ed. 713. In re Lake Chelan Land Co., 9 Cir., 257 F. 497, 5 A.L.R. 557.

actions on which they rest, in their origin, nature or circumstantial relationship, have had in them any element of general unfairness to the corporation or to other creditors. What constitutes such a general unfairness obviously is not capable of limitative definition. In many instances it may be wholly a relative factor, emerging only from a balancing of all the facts of the particular situation, but soundly touching the conscience of the court as giving rise to an equitable disparity in comparative claim position.

The claim here involved was for cash advances, totalling $4,950, made to the corporation in 1935, 1936 and 1937. At the time these advances were begun, the surplus of the corporation, which had once exceeded $6,000, had been exhausted, and its authorized capital of $20,000 was impaired to the extent of over $2,000. On the record, it seems clear that, from the time the advances were made, down to the bankruptcy in 1939, the corporation could not have made repayment of them and have had sufficient liquid assets remaining to continue operations as a going concern. Budge apparently recognized this fact, for he did not attempt to make repayment to himself of these advances. As the financial condition of the corporation then stood and continued, the only real hope that there could have been of obtaining repayment would be through liquidation. In fact, as the advances were made, there was no attempt to fix a time for their repayment; no note or other definitive obligation was ever taken; and there was no agreement for the payment of interest. The cash was all advanced before the claims of the other general creditors involved were incurred, and, in view of the financial condition of the corporation, of Budge's relationship to it as hereinafter discussed, and of the manner in which the transactions were handled, the advances, as against the other general creditors, should have been treated as the equivalent of capital contributions.

But of even stronger equitable significance, I think, in its relationship to the claims of other general creditors, is the manner in which the corporation was being run and the transactions were handled. Budge and Rose treated the affairs of the corporation, in practical effect, as if it were their own. They had been elected directors in 1922, together with another stockholder, but the records of the corporation show no meetings of or actions by the board of directors from 1922 to 1938. As a matter of fact, the third stockholder ceased to be a director in 1925, and, from that time until 1938, the corporation never had a fully constituted board of directors of three members, as required by its by-laws and by the Minnesota Business Corporation Act, Minn. Laws of 1933, Ch. 300, § 27, Mason's Minn.Stat.1940 Supp., § 7492-27.

During all of this period, Budge and Rose ran the business as they saw fit. They fixed their own salaries, notwithstanding that the by-laws required that such action be taken only by the directors acting as a board. In 1926, they undertook to pay a corporate dividend, without any resolution or formal action by the board of directors, as prescribed by the by-laws. In 1935, they purchased a printing press, at a cost of $13,200,—for which $2,000 of the amount included in Budge's claim was advanced as a down-payment—in formal disregard of the by-law provisions that no contract for equipment in excess of $200 should be made without first having been approved by the directors. The purchase of the printing press also increased the indebtedness of the corporation substantially beyond the $10,000 limitation fixed by its articles of incorporation, and, with Budge's advances included, it remained above that limitation down to the time of bankruptcy. In addition, the large loss which the printing press transaction occasioned to the corporation was a material factor in precipitating its ultimate liquidation.

For a period of thirteen years, and during the time that Budge's claim was coming into being, there was thus no duly constituted board of directors, as required by the by-laws and the state statutes, to review the situation of the corporation and to exercise its collective judgment on whether the corporation should have purchased the $13,200 printing press in 1935, for which Budge made his initial advance of $2,000 as a down-payment; whether, in view of the corporation's questionable financial condition and doubtful business prospects, it was at all advisable to borrow money to attempt to continue its operations; and whether, when Budge decided not to take the risk of making further advances, and the corporation still apparently was without adequate means to carry on its operations satisfactorily, it ought fairly to have

undertaken to incur additional commercial indebtedness—the claims of all other creditors here involved having come into existence subsequent to the making of Budge's advances.

It will not do, it seems to me, to say that all of this was mere formality and that the result in any event probably would have been the same. Whether Budge would have taken the same action, if he had been called upon to sit down as a member of a collective board and responsibly review the condition of the corporation, I do not know. Nor, of course, can I say what the two other members of an organized board of directors might have done. The point is that there never was any such action taken; the situation never had anything but individual consideration, in which a personal interest was involved. Under Minnesota law, such individual consideration and action could not constitute the equivalent of formal, deliberative and collective action by a duly constituted board of directors. Pink v. Metropolitan Milk Co., 129 Minn. 353, 152 N.W. 725, 726; Baldwin v. Canfield, 26 Minn. 43, 1 N.W. 261, 276.

It seems to me that subsequent creditors in dealing with the corporation were entitled to believe that its affairs were being regularly and responsibly handled, in the manner which the articles of incorporation and the statutes prescribed, and that any transactions which might have been had between an officer and the corporation would rest, not upon his own individual will and judgment, but upon regular and responsible corporate action. They had the right to assume, I think, that the course of the corporation was being responsibly charted by a board of directors, and that its financial situation was being similarly reviewed. I believe there was a protection which the law properly should recognize as inhering to them in such a course of action. That protection in the present situation must be regarded as being something more than a mere formality, since the financial situation of the corporation was such as reasonably to suggest a doubt whether Budge's advances ought at all to have been permitted to be made in order to continue the corporation's operations, and whether, after Budge apparently decided not to risk further advances and the financial condition of the corporation was unimproved, the indebtedness to the other general creditors ought fairly to have been permitted to be incurred.

If Budge wanted to answer those questions instead of having a board of directors do so, I think, as against subsequent general creditors, there would exist a disparity of equitable position that should require his claim to be subordinated. He ought not to ask the court and the other creditors to approve his own usurpation of a board of directors' functions, in order to allow him to have the benefit of an equal claim position in the bankruptcy which has resulted.

I would reverse the judgment of the District Court and remand the case with directions to subordinate Budge's claim.