**In the Matter of LUMBER INCORPORATED, Bankrupt.**

No. B-31992.

United States District Court
D. Oregon.

July 2, 1954.

---

The following is the opinion of Referee in Bankruptcy Snedecor:

Lumber Incorporated, an Oregon corporation, was adjudged a bankrupt upon its voluntary petition filed October 19, 1951. Since its incorporation June 13, 1946, it had been engaged in the business of buying and selling lumber at wholesale. Nathan Bradley, a director and vice-president of the bankrupt, filed a proof of claim in the sum of $46,076.74 for the balance owing to him on loans to the corporation evidenced by promissory notes.

The issues before the Referee stem from the trustee's objection to the allowance of this claim, coupled with trustee's petition for affirmative relief against the claimant Bradley. The pretrial order summarizes the issues of law to be determined from the facts as follows:

1. Shall the claim of Nathan Bradley in the sum of $46,076.74 be allowed or disallowed or allowed in part; or

2. Shall any offsets be established and determined as against such claim; or

3. Shall such claim be subordinated to the claims for payment of other creditors; or

4. Shall an affirmative judgment enter against Nathan Bradley on a counterclaim for recovery of a voidable preference under the provisions of Section 60 of the Bankruptcy Act and for recovery of a fraudulent conveyance under Section 67 of the Bankruptcy Act;

5. Shall Nathan Bradley be required to pay over to the trustee herein any part or all of the moneys received by him from the bankrupt;

6. Shall the corporate veil be pierced and Bradley held personally responsible for all the debts of the corporation;

7. If the trustee is entitled to affirmative relief against Bradley, is Bradley entitled to offset the amount of his claim against the amount of any affirmative judgment entered against him;

8. Shall any other affirmative relief be ordered as against Nathan Bradley.

From the pretrial order and the evidence, the Referee makes the following

### Findings of Fact

1. Bankrupt had an authorized capital of $50,000 divided into 500 shares of common stock of a par value of $100 each. Its three stockholders subscribed for one-half of the authorized capital as follows: Nathan Bradley 125 shares—$12,500; William C. Daniels 115 shares—$11,500 and Rita M. Daniels, his wife, 10 shares—$1,000.

2. At the first meeting of stockholders held June 19, 1946, the three

subscribing stockholders were elected directors. They met immediately as directors and elected William C. Daniels president and general manager at a salary of $1,000 per month; Nathan Bradley vice-president at a salary of $500 per month; and Mrs. Daniels secretary and treasurer at a salary of $250 per month. There are no minutes of any subsequent meetings except annually to re-elect the same directors and officers. However, on June 5, 1951, a special meeting was held to authorize the settlement of the actions for damages pending trial brought by American Lumber Corporation and Builders Supply Company, Inc. (Exhibit 6.)

3. Throughout the bankrupt's existence Bradley continued as an officer and director of the bankrupt and, as such, received monthly operating statements and balance sheets and was familiar with its operations, affairs and financial condition.

4. Bradley came to Oregon in 1933. He had been engaged in the wholesale lumber business in Memphis. He and others acquired timber holdings in Oregon and Washington and operated a sawmill under the name of Bradley Lumber Company. Later he became one of the partners of Van Dyne Lumber Sales Company which was dissolved in 1946. He had known Daniels for three or four years as a lumber buyer for Van Dyne. Upon the dissolution of the Van Dyne firm, Daniels said that he was going into the wholesale lumber business and asked Bradley to invest with him. Daniels' attorney, Maurice W. Seitz, performed the legal services in the organization of Lumber Incorporated. It was launched with an initial cash capital of $12,500 paid by Bradley and accounts receivable from Daniels and his wife on their stock subscriptions totaling $12,500. Their stock was paid for in various installments. A total of $4,900 had been paid by December 31, 1946, and a total of $10,700 had been paid by September 30, 1947. Another $1,000 was paid September 30, 1948, and the balance of $800 was paid by June 30, 1949. (Exhibit B of Pretrial Order.)

5. Daniels at all times performed all the usual duties and functions of a president and general manager. He did the buying and selling and arranged for credit at the First National Bank. He was authorized to execute all notes and other instruments required in borrowing money from the bank. He and the bookkeeper were the only ones authorized to sign checks on the company's bank account. Bradley acted in an advisory capacity, and during the first year or two came to the office every day when in Portland. He furnished the names of prospective customers and made contacts with lumber dealers. In November or December 1948 Bradley, then about 69 years old, suffered a severe illness. From that time on he spent three to four months each winter and spring in southern climates and, when in Portland, he came to the office only two or three times a week. During his absence from Portland he made some contacts with dealers, investigated and reported to Daniels on some bad accounts in San Francisco and Los Angeles, and received the monthly operating statements from Daniels.

6. From July 1946 through October 1948, Daniels received a salary of $1,000 a month, and his wife received $250 a month. From November 1948 through June 1949, Daniels received a salary of $800 a month, and his wife $200 a month. From July 1949 through February 1950, they received salaries respectively of $600 and $200 per month. Thereafter, until October 1951, they received salaries respectively of $800 and $200 a month. On October 15, 1951, they received salaries for the first half of the month of $400 and $100. Four days later the petition in bankruptcy was filed. The total combined gross salaries paid to Daniels and his wife during the five and one quarter years amounted to $68,500, or an average of approximately $1,080 per month. (Exhibit C of Pretrial Order.)

7. In addition to Bradley's stock subscription of $12,500 he made loans to the corporation during its first year of existence totaling $80,000, of which the first $10,000 was repaid within four days. The subsequent loans of $70,000 remained unpaid except for interest at 6% per annum until November 16, 1949, when $10,000 was repaid. Thereafter, all monthly payments to Bradley of interest and salary ceased, and the monthly payments were applied in reduction of the principal of his loans. In addition to monthly installments, he received a payment on principal of $5,000 on January 16, 1951. In this manner the principal of the indebtedness to Bradley was reduced from $70,000 in November 1949 to $41,054.17 on October 15, 1951. The foregoing figures do not include the unauthorized use of an additional $20,-000 of Bradley's funds for a period of three months in 1948. This sum came from Paul Thompson for a special purpose and was diverted to the use of the company by Daniels during Bradley's absence and without his authority. (Exhibit D of Pretrial Order.)

8. The last two payments made to Bradley in reduction of the principal of his loan were $725 on June 30, 1951, and $725 on July 21, 1951. These were made within four months prior to the filing of the petition in bankruptcy. Prior thereto, and within one year before the bankruptcy, Bradley had received payments on account of loans aggregating $10,725.

9. Bradley received a salary from the company of $500 a month from July 1946 through October 1948. From November 1948 through June 1949 he received $400 a month. From July 1949 through October 1949 he received $300 a month. Thereafter no salary was paid to him or accrued to him on the books of the company. The total gross salary paid to him over the first three and a half years of the company's existence amounted to $18,400. His claim against the estate of the bankrupt does not include any unpaid salary.

10. Bradley's salary was discontinued in November 1949 because:

(a) The corporation income had fallen below former levels;

(b) Bradley had substantial income tax liability from other operations and desired repayment of capital advances rather than interest or salary income from Lumber Incorporated; and

(c) Bradley was not at the time contributing full time activity to the corporate business.

11. At all times subsequent to August 20, 1947, Lumber Incorporated held, by assignment from Bradley, an irrevocable interest in a life insurance policy with Massachusetts Mutual Life Insurance Company upon which the trustee has collected a surrender value of $11,030.80. Such policy had a surrender value of $9,457.80 at the time of its assignment. (Exhibit 29.) The value of such policy does not appear as an asset on the books of the bankrupt.

12. The bankrupt's total sales by fiscal years August 1 to July 31 are as follows:

| | |
|---|---|
| June 12, 1946 to July 31, 1946 | $ 117,242.56 |
| August 1, 1946 to Juy 31, 1947 | 1,173,031.59 |
| August 1, 1947 to July 31, 1948 | 812,254.37 |
| August 1, 1948 to July 31, 1949 | 430,610.18 |
| August 1, 1949 to July 31, 1950 | 761,454.93 |
| August 1, 1950 to July 31, 1951 | 685,592.80 |
| Total Sales | $3,980,186.43 |

13. During the same period the purchases of lumber totaled $3,703,853.67. All undisputed bills for lumber purchases prior to June 1951 were paid within the 2% discount period, so that the total discounts earned amounted to $54,975.20. (Pretrial Exhibit 26 changed to Exhibit 35.) Some bills for lumber purchased in June, July and August 1951 were not paid. They amounted to $23,264.25 and are the subject of claims in this bankruptcy.

14. The bulk of the claims filed in this case consists of damages arising out of the failure of the bankrupt to fill orders for future delivery of lumber during the year 1950. Such claims in-

clude the one represented by counsel for the trustee in the sum of $238,843 which is based upon a judgment entered October 5, 1951, in the United States District Court for the District of Oregon. Similar damage claims, but unliquidated as to amount, have been filed by:

American Lumber Corporation for $22,896.31;

Cottman Builder's Supply Co., Inc., for $10,250.21.

15. As an overall picture, the claims filed in this proceeding may be classified as follows:

| | |
|---|---|
| (a) Priority tax claims (paid) | $ 478.55 |
| (b) Damage claims for failure to fill orders in 1950 | 271,990.52 |
| (c) Nathan Bradley's claim for money loaned | 46,076.74 |
| (d) Unpaid lumber bills incurred during last months of operation | 23,264.25 |
| (e) Adjusted balances claimed on 1950 lumber shipments | 12,150.33 |
| (f) Brown & Bigelow for 1951 advertising calendars | 228.39 |
| (g) Baltimore Lumber Company (disputed) | 2,869.06 |
| Total general claims | $356,579.29 |

16. Although Nathan Bradley was well and favorably known in lumber circles, there is no evidence that any creditor ever extended credit to Lumber Inc. in reliance upon Bradley's connection with the company, or in reliance upon any representation made by Bradley. In addition to the liberal credit extended to Lumber Inc. by Nathan Bradley, it obtained a line of credit from The First National Bank of Portland. Here all credit arrangements were made and all notes signed by Daniels as president. The bank's first loan was made May 1, 1947, in the sum of $30,000 upon the company's unsecured note. It was repaid within sixty days. In obtaining this loan Daniels stated that Nathan Bradley, who was then in Arizona, would subordinate his loans to those of the bank. Such a subordination agreement was ultimately executed by Bradley March 31, 1948. (Exhibit 1.) From then on until January 1951 the company enjoyed a line of credit with the bank upon an unsecured basis ranging up to $35,000. The last unsecured loan was in the sum of $34,500 and was made January 3, 1951. It was reduced to $24,500 February 3, 1951, and to $19,500 on March 6, 1951. Final payment was made May 18, 1951. (Pretrial Exhibit 10.) From January 1951 to September 1951 the bank continued to make other loans, but they were secured by assignment of accounts receivable. The last bank loan was repaid September 19, 1951.

17. Notwithstanding some heavy losses suffered from time to time on bad accounts, the company met its current expenses and discounted all bills for lumber purchased until it became involved in the trial of two damage suits in June 1951. (Exhibits 13 and 14.) Satisfactory arrangements were made for the settlement and dismissal of these two suits, but the large judgment for damages entered October 5, 1951, in favor of Hillcrest Lumber Company brought an end to the company's operations. (Exhibit 12.)

18. At the time of the hearing of this controversy in March 1953 the trustee had realized from the liquidation of the bankrupt's assets the sum of $16,809.98. After the payment of certain expenses of administration and the priority tax claims, the trustee had on hand at that time the sum of $16,146.03. Since then the trustee has received from Nathan Bradley the return of the preference in the sum of $1,450, making a total on hand of $17,596.03.

19. Although Bradley owned fifty per cent of the outstanding stock, he did not own or contrive in any manner to exercise a controlling interest in the bankrupt. From its inception and throughout its existence the other two stockholders, Daniels and his wife, constituted a majority of the Board of Directors of the corporation.

20. Bradley did not sell any lumber to the bankrupt or buy any from it. He did not dominate the company or use it as an instrumentality to further his own interests. He complained to Daniels from time to time whenever he dis-

covered that a bad deal had been made, but he never attempted to assume control of the company. There is no evidence that he knew of or approved the commitments made by Daniels in 1950 for the future deliveries of lumber. There is no evidence of fraud or inequitable conduct upon the part of Bradley in his dealings with the bankrupt.

21. The last two monthly installments of $725 each paid to Bradley on account of the principal of his loans were received by him within the four months preceding the company's voluntary bankruptcy. Bradley concedes that these payments constituted preferences under Section 60 of the Bankruptcy Act and has offered to pay the trustee the sum of $1,450.

22. The bankrupt was a going concern engaged actively in the wholesale lumber business through May 1951. It continued operations thereafter through September 1951, but its volume had been reduced far below the level of a profitable business. (Monthly Profit and Loss Statements, Exhibit 9.)

Discussion of Law and Facts

Most of the trustee's contentions stem from the claim that the corporation was knowingly launched with inadequate invested capital and that the loans up to $70,000 subsequently made by Bradley to the company should be considered as capital contributions, and that all amounts repaid to Bradley in the form of principal and interest should be returned to the trustee for the benefit of the present creditors. For the same reason it is contended that Bradley's claim for $46,076.74 should be disallowed or subordinated to the claims of other creditors.

These contentions are not borne out by the evidence. Erickson, a certified public accountant, after reviewing the company's operations, testified that the working capital requirements of such a business would approximate eighty to ninety thousand dollars. It is not clear from his testimony whether he was of the opinion that the company could not have operated successfully without stockholder-invested capital of eighty to ninety thousand dollars, or whether its invested capital, together with available credit, should amount to eighty or ninety thousand dollars. The latter view is borne out by the testimony of two disinterested and highly successful wholesale lumber dealers in Portland. Charles Patrick, who has been in the business since 1915, testified that in dealing with responsible customers a capital of $25,000 is adequate to do a business of $200,000 a month. Mitchell Tillotson, vice-president of The First National Bank of Portland, expressed the same opinion.

Roy M. Janin, who has been in business since 1934, testified that he started his business with $10,000 and had been successful in carrying on gross sales of $1,000,000 a year. He stated that he knew a half dozen wholesale lumber concerns that started with not over $25,000 capital.

The operations of the bankrupt demonstrate the adequacy of its initial capitalization. During the first five months of its existence it purchased $472,000 worth of lumber and sold $506,000 worth of lumber, with the borrowing of only $10,000 in October 1946 which it repaid within four days. Furthermore, during the first five years of the company's operations, it discounted all bills for the purchases of lumber and, notwithstanding some heavy losses, repaid all borrowings to the bank and approximately $29,000 on the loans of Nathan Bradley. It accomplished this while paying liberal salaries to its officers. Its downfall was brought about by a few heavy losses in accounts receivable and by Daniels' speculative commitments in 1950. It was not in any sense due to the inadequacy of its initial capital.

When a corporation is organized in good faith with adequate capital to carry on a profitable business, there is no requirement in law or equity that its stockholders must provide amply for unforeseen losses not ordinarily contemplated in such a business. As Adolph Berle put it in the article quoted in the

trustee's brief, "to preserve the independence of an enterprise which is needed to support the continuation of separate legal personality the stockholders must provide the entity with separate assets sufficient to give it *at least a reasonable business chance to carry out its asserted functions*". Nathan Bradley invested $12,500 in the stock of the company and displayed his confidence in the ability of Daniels to manage the business successfully by lending the corporation $70,000 to enable it to discount its purchases. He permitted this money to remain in the hands of the company for approximately three years without security of any kind. When the company needed additional working capital, he subordinated his debts to those of the bank. He voluntarily reduced his salary in November 1948 and discontinued it altogether in October 1949. Thereafter, with two exceptions, he arranged for the reduction of the principal of his loan in monthly installments. In November 1949 he insisted upon the payment of $10,000 which he needed for a special purpose. At that time the claims of the present creditors, except that of Nathan Bradley, were not in existence. In January 1951 he obtained a payment of $5,000. Except for these two payments, he received monthly installments on account of principal beginning in December 1949 and continuing through July 1951. The last two installments were paid to him after two actions for damages had been satisfactorily settled out of court and the actions dismissed. (Exhibits 13 and 14.) However, the Hillcrest Lumber Company's action for damages was pending. Bradley has offered to return the two installments received within four months prior to bankruptcy.

Having found that the bankrupt was organized with adequate capital to operate the contemplated business, we must now consider the trustee's contention that a dominant stockholder used the corporation as an instrumentality to further his own ends at the expense of the creditors. This contention is variously stated by counsel for the trustee in the Pretrial Order as follows:

(f) The policy was intentionally followed of keeping the debtor corporation constantly impoverished, and the moneys withdrawn from the corporation by its officers, directors and stockholders were fixed at such a level as to effectuate that policy.

(h) Bradley knew or had reason to believe that all payments made to him would and did have the effect of hindering, delaying and defrauding creditors of the bankrupt.

(n) The said corporation was in fact used as a vehicle to finance highly speculative transactions in lumber with the purpose and effect of shifting from Bradley and Daniels to other persons the risk of loss involved in said transactions, preserving to Bradley and Daniels the benefit of any profits which might accrue in the event that such speculations should prove to be successful. This was accomplished primarily by the policy consistently followed by the corporation of launching the corporation with inadequate equity capital and keeping the corporation insolvent or on the brink of insolvency by withdrawals of excessive salaries and purported payments to Bradley of interest and principal on the moneys he furnished to the corporation to enable it to conduct said operations.

(s) The formation and operation of the company operated as a fraud upon creditors and the interposition of the corporate entity between Bradley and his creditors would produce an injustice to such creditors.

(t) This is a proper case for the disregard of the corporate fiction and for requiring Bradley to discharge the debts incurred by the corporation on his account and for his benefit.

As a general rule, the bankruptcy court must distribute the funds of a bankrupt estate to the creditors according to the priorities prescribed in Section 64 of the Bankruptcy Act, 11 U.S. C.A. § 104. However, there is a line of

decisions which holds that the court under its general equitable powers may subordinate claims of certain creditors to those of others where the fraudulent or inequitable conduct of such claimants demands it. The leading and best known case on this subject is the Supreme Court decision in Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 246, 84 L.Ed. 281, 41 Am.Bankr.Rep., N.S., 279. In this case a judgment by confession based upon old salary claims of a dominant and controlling stockholder of a corporation had been entered prior to the bankruptcy of the corporation. Such claims had been permitted to lie dormant for years. The dominant stockholder sought to enforce them only after the corporation became financially involved. He first bid in the property of the corporation at a sheriff's sale for a small amount and immediately conveyed it to another "one man corporation" for $20,000 in stock. Later he caused the first corporation to file bankruptcy, and sought the approval of his large judgment claim for accumulated salaries in the sum of $33,000. Justice Douglas in reversing the circuit court summarized the cases in which the bankruptcy court would exercise its equitable powers to prevent fraud or injustice as follows:

"In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate. And its duty so to do is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder. That is clearly the power and duty of the bankruptcy courts under the reorganization sections. In Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 [38 Am.Bankr. Rep., N.S., 692], this Court held that the claim of Standard against its subsidiary (admittedly a claim due and owing) should be allowed to participate in the reorganization plan of the subsidiary only in subordination to the preferred stock of the subsidiary. This was based on the equities of the case—the history of spoliation, mismanagement, and faithless stewardship of the affairs of the subsidiary by Standard to the detriment of the public investors. Similar results have properly been reached in ordinary bankruptcy proceedings. Thus, salary claims of officers, directors, and stockholders in the bankruptcy of 'one-man' or family corporations have been disallowed or subordinated where the courts have been satisfied that allowance of the claims would not be fair or equitable to other creditors. And that result may be reached even though the salary claim has been reduced to judgment. It is reached where the claim asserted is void or voidable because the vote of the interested director or stockholder helped bring it into being or where the history of the corporation shows dominancy and exploitation on the part of the claimant. It is also reached where on the facts the bankrupt has been used merely as a corporate pocket of the dominant stockholder, who, with disregard of the substance or form of corporate management, has treated its affairs as his own. And so-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder not only in the foregoing types of situations but also where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan."

We find nothing in the facts before us to warrant the exercise of the court's unusual equitable powers in regard to the claim of Bradley as an officer and stockholder of the bankrupt. The evidence does not support the contention

that he was the dominant or controlling stockholder or managing officer of the corporation. He did not use the corporation as an instrumentality to serve his own interests or those of any other corporation. He did not disregard the form or substance of corporate management, nor did he treat the corporation's affairs as his own.

There is no evidence that he approved or even knew of Daniels' speculative commitments early in 1950 for future deliveries of lumber during the year. He has not profited from the operations of the company. The bankrupt was not a "one-man or one-family corporation". Bradley did not seek to secure himself or gain any undue advantage over other creditors except for the small preference obtained under Section 60 of the Bankruptcy Act, 11 U.S.C.A. § 96. This has been restored to the trustee.

The company started off as a profitable enterprise. During its first year it made a substantial profit even after charging off bad debts of $42,030.49. Most of this loss arose out of misplaced confidence in one lumber dealer. With such a record one would be led to believe that the company could operate profitably by avoiding further unusual losses. The company showed a small loss of $969.04 at the end of the next fiscal year July 31, 1948. In the third year with volume reduced fifty per cent, the loss amounted to $17,782.89. However, in the fourth year with greatly increased volume the company showed a profit of $1,789.03 after charging off bad debts of $7,328.-34. In the fifth year the company lost $25,885.87 with a charge off in bad debts of $15,182.61. (Exhibit 35.)

While it appears that there was bad judgment in the management of the company, no one complained more bitterly about it than Nathan Bradley. (Exhibit 24.) In fact, he was the only one who had any cause to complain until the company reached the end of its resources in the face of unprecedented damage claims.

There is nothing in the evidence to indicate that Bradley intended that his investment of $12,500 and his loans of $70,000 should be used in highly speculative or risky transactions. He knew the lumber business and had every reason to believe that the company as financed could earn substantial profits if properly managed. He backed the judgment and energy of a younger man and gave him full rein and ample credit for a successful operation. The corporation was properly created under the laws of Oregon and was dealt with in all respects as a corporate entity. No one was deceived and no one extended it credit upon any other basis. All monies paid to Bradley were disbursed in the regular course of business by a corporation engaged in a legitimate enterprise. The trustee in bankruptcy had available the complete records and files of the bankrupt, including the file of personal correspondence between Daniels and Bradley. (Exhibit 24.) This file reveals that Bradley placed complete confidence in Daniels and his wife and maintained most cordial and friendly relations with them in spite of his criticisms of some of Daniels' deals. There is nothing in this intimate and more or less confidential file of correspondence to indicate that Bradley intended to misuse the corporation, or that he had any knowledge of Daniels' speculative commitments in 1950. We do find in Bradley's letter to Daniels December 14, 1948, the remark that he had to get home and "get some kind of a deal on our stock so I can take a loss on it this year while my rate is so damn high". The evidence does not establish what stock he had in mind, nor is there any evidence that Bradley ever disposed of his stock in the bankrupt.

It would serve no useful purpose to discuss in detail each contention of the trustee. They are based largely upon inferences inaccurately drawn from the facts as we find them. The authorities cited by counsel for the trustee are not applicable to the facts in this case. For instance, consider the facts in a few of the cases upon which the trustee places most reliance.

In Albert Richards Company v. The Mayfair, Inc., (Sherman), 287 Mass. 280, 191 N.E. 430, 433, the defendant Sherman tried to run the business of the Mayfair Club which required expenditures of well over $75,000 on a stock investment of $100 by himself and possibly $5,000 or $6,000 by another. He advanced money on loans and acquired debts of the corporation totaling $46,227, then took a demand note for for this amount secured by a chattel mortgage on all tangible assets of the corporation. At that time there were other general creditors to the amount of about $7,000. Six months later he foreclosed his mortgage, purchased the property for $5,000 and later opened the place for business in the name of a new corporation called the "Club Mayfair, Inc." In setting aside the mortgage foreclosure in favor of other creditors, the court said:

"This court adheres to the usual rule that ownership by a person of all the stock of a corporation does not warrant disregarding the corporate entity and does not fasten on such person liability for the obligations of the corporation. * * * Circumstances sometimes exist which permit a sole stockholder to prove his claim against the corporation in competition with other creditors * * *, but here Sherman tried to run the business which required expenditures of well over $75,000 on a stock investment of $100 by himself and possibly $5,000 or $6,000 by another. He entirely controlled the affairs of the corporation, and was in no proper sense a creditor, but was an owner of a substantial part of it. * * * Such stockholder furnishing the capital necessary to the size of the corporation as a loan cannot in the circumstances of this case gain a preference over creditors in the distribution of the assets. * * *

"If Sherman is not to be regarded as a legitimate creditor of the corporation, manifestly the note and mortgage should be set aside. Sherman likewise would have no right to come in and prove his claims to the detriment of other creditors."

In re Gillespie Tire Co., D.C., 54 F. Supp. 336, 56 Am.Bankr.Rep., N.S., 217. In 1938 Mrs. Mabry Gillespie incorporated her tire business and became the owner of the entire capital stock except two qualifying shares issued to employees. A year later, when the corporation was insolvent, Mrs. Gillespie caused the corporation to transfer its assets to her and she continued the business under the trade name of Mabry Gillespie Tire Co. for another six months. During this time she paid herself large salaries and rentals and gave preference in payment of corporate liabilities to favored creditors at the expense of General Tire & Rubber Co., her largest creditor. In the bankruptcy of the corporation Mrs. Gillespie filed claims for salary, rent and moneys alleged to have been advanced or paid by her for the corporation. The case was tried upon the trustee's objections to her claims. The court held that she ignored the corporate form and became in reality a trustee for the creditors when she took over the assets and operated the business in her own name. The judge affirmed the judgment entered by the referee in favor of the trustee in bankruptcy against Mrs. Gillespie in the sum of $9,173.22 representing salaries and rentals paid to her from the corporate assets after she took over the business. The court found that Mrs. Gillespie was in fact the sole and dominant stockholder, and that her affairs and those of the bankrupt corporation were so closely assimilated that in substance the corporation was little more than a corporate pocket. This seems to be one of the few cases in which the bankruptcy court has entered an affirmative judgment in a summary proceeding against the dominant stockholder. In nearly all cases in which the bankruptcy court has been called upon to exercise its unusual equitable powers, it has confined itself to the subordination of the

claims of the dominant stockholder. In the Gillespie case, while it is not expressly decided, the facts indicate that Mrs. Gillespie must have assumed the corporate debts when she took over the assets and attempted to operate the business in her own name.

Gantenbein v. Bowles, 103 Or. 277, 203 P. 614, is a case in which the directors transferred all assets to themselves in satisfaction of old debts at a time when the corporation was insolvent and had long since ceased to do business.

In McIver v. Norman, 187 Or. 516, 205 P.2d 137, 213 P.2d 144, the rule of ignoring the corporate entity was applied to a "one man" corporation with no separate or independent capital.

In Burke Machinery Co. v. Copenhagen, 138 Or. 314, 6 P.2d 886, a creditor was given judgment against two partners doing business as Burke Machinery Co. The court held that, although the partners had incorporated the business under a different name, the partners had continued to transact business under the old firm name without advising creditors of the corporation.

The decision in Henderson v. Rounds & Porter Lumber Co., D.C., 99 F.Supp. 376, 381, contains an excellent discussion of facts under which a court is justified in ignoring corporate entities and in fixing liability upon the dominant stockholder. This is a case in which the trustee in bankruptcy of the Taylor Oak Flooring Company and certain of its creditors brought suit to place liability for the debts of the bankrupt upon Rounds & Porter Lumber Co. as a result of its fraud in dominating and manipulating the affairs of the bankrupt as its agent and in converting the assets to its use and advantage. Here the bankrupt was organized to manufacture oak flooring to be distributed chiefly through the defendant lumber company which owned a chain of wholesale and retail yards. Defendant subscribed and paid for fifty per cent of the stock—300 shares for $30,000. The remaining stock was issued to Taylor for $30,000 worth of sawmill machinery and equipment. Taylor operated the plant for six months under the supervision of the officers of the defendant and under a contract to sell its product to the defendant at $20 to $40 below prevailing market prices. While there was some evidence of inefficient operation, the court found that the principal and determinative factor in the failure of the bankrupt was the practice of selling lumber to the defendant at a loss. While the defendant owned only fifty per cent of the stock of the bankrupt, the court found that it had from the beginning dominated and manipulated the bankrupt's affairs for its own purposes and advantage and to the detriment of creditors. In placing the liability upon the dominant stockholder, the court said:

"In order to fix liability directly on defendant, the court must ignore the separate corporate entity of the Flooring Company. Normally, courts will and must respect such separate existence, but when, under the facts of a particular case, the administration of justice so requires, the fiction of corporate legal entity may be brushed aside and responsibility placed where it belongs. As stated in Nichols & Co. v. Secretary of Agriculture, 1 Cir., 131 F.2d 651, 655, quoting from Owl Fumigating Corporation v. California Cyanide Co., 3 Cir., 30 F.2d 812, 813: 'When, as against the general rule that two separately incorporated companies are separate and distinct entities, it is charged that one is a mere agency or department of the other and is used as an instrumentality to perpetrate fraud, justify wrong, avoid litigation or render it more difficult, or generally to escape liability for what are in substance its own acts, courts will put aside the screen and, looking upon the situation through the group of negative rules, determine affirmatively the truth and place responsibility where it actually belongs.' See, also: Darling Stores Corporation v. Young Realty Co., 8

Cir., 121 F.2d 112. The existence of this power cannot be challenged, but defendant asserts that the facts of this case do not warrant it being exercised. And, this is the real question presented in this case.

"Numerous rules, most of them negative in form, have been developed. For instance, ownership of capital stock of one corporation by another does not alone create identity of interests or the relationship of principal and agent; identity of officers alone is not sufficient; and the loan of money by one corporation to another does not make the lender liable for the acts of the borrower. And, there are other negative rules. See: Nichols & Co. v. Secretary of Agriculture, supra; Annotation, 145 A.L.R. 475. It is impossible to formulate a general rule applicable to all cases, and the courts have not attempted to do so. Rather the over all picture as it appears from the facts dictates whether or not the power should be exercised.

"Thus, in this case, if, aside from mere forms of law or legal fictions, the defendant dominated and manipulated the affairs of the Flooring Company for its own interest, rather than the best interest of the Flooring Company as a separate corporate entity, and used the latter as a mere agency or instrumentality for the advancement of its own interest, and in the process of so doing inflicted damage upon these plaintiffs, then the court should go directly to the real party in interest, and place responsibility on the defendant."

In Carter v. Bogden, 8 Cir., 13 F.2d 90, the court found that the corporation was insolvent at its inception because its creators had sold property to it at a gross overvaluation, and had taken notes for a part of the purchase price. These notes were subordinated to the claims of other creditors.

In Boyum v. Johnson, 8 Cir., 127 F.2d 491, the claimant was the controlling owner and manager of a corporation and virtually ran the corporation as his own. As a part of a plan of financing he advanced funds to avoid the necessity of increasing the capital stock. The court held that such advances should be subordinated to the claims of other creditors. In a later case the same court subordinated the claims of a president and manager of a bankrupt corporation upon the grounds that his sales contract with the company was fraudulent and that he launched the corporation with no capital, except that which might be realized out of the sale of memberships in a beach resort property. Goldie v. Cox, 8 Cir., 130 F.2d 695. However, the same court, with one dissenting opinion, held that the mere fact that a claimant was the controlling officer did not justify the court in penalizing him for making a loan to the company. Here the claimant owned only one-third of the capital stock. As its secretary and treasurer, he lent money to the corporation in a legitimate attempt to be helpful. The court said that the facts did not warrant the conclusion that he operated the bankrupt as a mere agent, adjunct, or instrumentality for his personal use. Barlow v. Budge, 8 Cir., 127 F.2d 440, 49 Am. Bankr.Rep., N.S., 120.

For a more exhaustive discussion of the equitable power of the bankruptcy court to subordinate or disallow claims, reference is made to the excellent article by Harry S. Gleick in the Referees' Journal, Vol. 25, No. 4, Page 99. The cases reviewed above and discussed in Gleick's article are all exceptions to the general rule that loans made even by a controlling stockholder in good faith to a corporation properly organized and dealt with, may participate with claims of other creditors in the liquidation of the corporate assets. Wheeler v. Smith, 9 Cir., 30 F.2d 59; Goldstein v. Wolfson, 2 Cir., 132 F.2d 624; In re Madelaine, Inc., 2 Cir., 164 F.2d 419; Theriot v. Plane, 9 Cir., 126 F.2d 1015, 49 Am. Bankr.Rep., N.S., 91. The facts in the case under consideration fall within the general rule. Bradley's loans were made

in good faith to a corporation being managed by the other principal stockholder. The funds were used to take advantage of the two per cent discount on purchases customary to the lumber trade.

There remains for consideration the trustee's contention that the eight monthly installments on principal paid to Bradley from October 1950 through May 1951, totaling $5,725, and the payment of $5,000 on January 16, 1951, should be set aside as fraudulent transfers made within one year prior to bankruptcy. During this period the corporation was actively engaged in business. Its lumber purchases amounted to $393,486.86 and its sales totaled $417,035.87. In addition to the gross profit of $23,549 for the period, its earned discounts amounted to $8,094.25. (Exhibit 35.) At the beginning of the period its balance sheet showed assets of $220,798.46 as against liabilities, exclusive of capital stock, of $199,956.98. At the end of the period its assets amounted to $113,458.52 as against liabilities of $96,816.85. The assets included some bad accounts receivable totaling $15,182.61 which where charged off two months later at the end of the fiscal year. (Exhibit 9.) The liabilities did not include the large damage claims then in dispute. During the same period the corporation borrowed from the bank $34,500 on its unsecured note, all of which was repaid within the period. Additional sums totaling $17,677.30 secured by assigned accounts receivable were borrowed from the bank in May 1951.

The sums totaling $10,725 paid to Bradley during this period were applied in reduction of his previous loans to the corporation. These payments were made for a fair consideration as defined in Section 67, sub. d(1) (e) and therefore were not fraudulent as to existing or future creditors within the meaning of Section 67, sub. d(2) (a), (b) or (c), 11 U.S.C.A. § 107, sub. d(1) (e), (2) (a–c). Nor were they made or received by Bradley with actual intent to hinder, delay or defraud creditors. It makes no difference whether the corporation was insolvent. It was meeting its obligations as they matured, and was being directed by men who displayed confidence throughout in the ability of the company to work out its difficulties. Even if it be argued that the desperate condition of the company belied their confidence in its ability to continue in business, there is nothing in their conduct to warrant the inference that they continued the business with actual intent to hinder, delay and defraud creditors. As Judge Sanborn stated in Barlow v. Budge, supra [127 F.2d 443]: "A mere mistake of judgment in continuing a business which is in financial difficulties is [not] in any respect akin to fraud or unfairness."

### Conclusion and Order

From the foregoing discussion of the law and facts, the Referee concludes that Nathan Bradley dealt with the bankrupt corporation fairly and in good faith as a creditor and is entitled to participate with other creditors in the distribution of assets.

Therefore, it is ordered that the trustee's objections to the claim of Nathan Bradley be overruled and that the claim be allowed in the sum of $46,076.74.

Justin N. Reinhardt, Portland, Or., for trustee.

J. S. Middleton and Cecil H. Greene, of Portland, Or., for claimant, Nathan Bradley.

McCOLLOCH, Chief Judge.

I adopt the opinion of the Referee, Estes Snedecor, as the opinion of the court.